KRING v. MISSOURI..

1. A; was convicted of murder in the first degree, and the judgment of condemnation was affirmed by the Supreme Court of Missouri. A previous sentence pronounced on his plea of guilty of murder in the second degree, and subjecting him to an imprisonment for twenty-five years, had, on his appeal, been reversed and set aside. By the law of Missouri in force when the homicide was committed this sentence was an acquittal of the crime of murder in the first degree; but before his plea of guilty was; entered the law was changed, so that by force of its provisions, if a judgment on that plea be lawfully set aside, it shall not be held to be an acquittal of the higher crime. *Held*, that as to this case the new law was an *ex post facto* law, within the meaning of sect. 10, art. 1, of the Constitution of the · United States, and that he could not be again tried for murder in the first degree.

2. The history of the *ex post facto* clause of the Constitution reviewed in connection with its adoption as a part of the Constitution, and with its subsequent construction by the Federal and the State courts.

3. The distinction between retrospective laws, which relate to the remedy or the mode of procedure, and those which operate directly on the offence, is unsound where, in the latter case, they injuriously affect any substantial right to which the accused was entitled under the law as it existed when the alleged offence was committed.

4. Within the meaning of the Constitution, any law is *ex post facto* which is enacted after the offence was committed, and which, in relation to it or its consequences, alters the situation of the accused to his disadvantage.

ERROR to the Supreme Court of the State of Missouri.

The case is stated in the opinion of the court.·

*Mr. Jefferson Chandler* and *Mr. L. D. Seward* for the plaintiff in error.

*Mr. Samuel F. Phillips* for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

Kring was indicted in the Criminal Court of St. Louis for murder in the first degree, charged to have been committed Jan. 4, 1875, and he pleaded not guilty. He has been tried four times before a jury, and sentenced once on a plea of guilty of murder in the second degree. His case has been three times before the Court of Appeals, and three times before the Supreme Court of the State. In the last instance, the Supreme Court affirmed the judgment by which he was found guilty

of murder in the first degree and sentenced to be hung. He thereupon brought the present writ of error.

It is to be premised that the Court of Appeals is an intermediate appellate tribunal between the Criminal Court of St. Louis and the Supreme Court of the State, to which all appeals of this character are first taken.

At the trial, immediately preceding the last one in the court of original jurisdiction, the prisoner was permitted to plead guilty of murder in the second degree. The plea was accepted by the prosecuting attorney and the court, and he was thereupon sentenced to imprisonment in the penitentiary for twenty-five years. He took an appeal from the judgment on the ground that he had an understanding with the prosecuting attorney that if he would plead as he did, his sentence should not exceed ten years' imprisonment. The Supreme Court reversed the judgment, and remanded the case to the St. Louis Criminal Court for further proceeding, where, when the case was again called, he refused to withdraw his plea of guilty of murder in the second degree, and refused to renew his plea of not guilty, which had been withdrawn when he pleaded guilty of murder in the second degree. The court, then, against his remonstrance, made an order setting aside his plea of guilty of murder in the second degree and directing a general plea of not guilty to be entered. On this plea he was tried, found guilty, and sentenced to death, and the judgment, as we have already said, was affirmed by the Supreme Court of the State.

By refusing to plead not guilty as charged in the indictment, and to withdraw his plea of guilty of murder in the second degree, the defendant raised the point that the proceedings under that plea — namely, its acceptance by the prosecuting attorney and the court, and his conviction and sentence under it — were an acquittal of the charge of murder in the first degree, and that he could not be tried again for that offence. This point he insisted on in the Circuit Court, the Court of Appeals, and the Supreme Court.

Both these latter tribunals, in their opinions, which are a part of the record, conceded that such was the law of the State of Missouri at the time the homicide was committed. But they overruled the defence on the ground that by sect. 23, art.

2, of the Constitution of Missouri, which took effect Nov. 30, 1875, that law was abrogated, and for this reason he could be tried for murder in the first degree, notwithstanding his conviction and sentence for murder in the second degree.

As after the commission of the crime for which he was indicted this new constitution was adopted, and, as it is construed by the Court of Appeals and the Supreme Court, it changes the law as it then stood, to his disadvantage, the jurisdiction of this court is invoked on the ground that, as to this case, and as so construed, it is an *ex post facto* law, within the meaning of sect. 10, art. 1, of the Constitution of the United States.

That it may be clearly seen what the Supreme Court of Missouri decided on this subject and what consideration they gave it, we extract here all that is said in their opinion about it.

" There is nothing in the point," they say, " that after an accepted plea of guilty of murder of the second degree the defendant could not be put upon trial for murder of the first degree. We shall, on that proposition, accept what is said by the Court of Appeals in its opinion in this cause."

What that court said on this subject is as follows : —

" The theory of counsel for defendant that a plea of guilty of murder in the second degree, regularly entered and received, precludes the State from afterwards prosecuting the defendant for murder in the first degree, is inconsistent with the ruling of the Supreme Court in *State* v. *Kring* (71 Mo. 551), and in *State* v. *Stephens* (id. 535). The declarations of defendant that he would stand upon his plea already entered were all accompanied with a condition that the court should sentence him for a term not to exceed ten years, in accordance with an alleged agreement with the prosecuting attorney, which the court would not recognize. The prisoner did not stand upon his plea of guilty of murder in the second degree ; he must, therefore, be taken to have withdrawn that plea, and, as he refused to plead, the court properly directed the plea of not guilty of murder in the first degree to be entered.

" Formerly it was held in Missouri (*State* v. *Ross*, 29 Mo. 32) that, when a conviction is had of murder in the second degree on an indictment charging murder in the first degree, if this be set aside, the defendant cannot again be tried for mur-

der in the first degree. A change introduced by sect. 23 of art. 2 of the Constitution of 1875 has abrogated this rule. On the oral argument something was said by counsel for the defendant to the effect that under the old rule defendant could not be put on his trial for murder in the first degree, and that he could not be affected by the change of the constitutional provision, the crime having been committed whilst the old constitution was in force. There is, however, nothing in this; this change is a change not in crimes, but in criminal procedure, and such changes are not *ex post facto*. *Gut* v. *State*, 9 Wall. 35; *Cummings* v. *Missouri*, 4 id. 326."

We have here a distinct admission that by the law of Missouri, as it stood at the time of the homicide, in consequence of this conviction of the defendant of the crime of murder in the second degree, though that conviction be set aside, he could not be again tried for murder in the first degree. And that, but for the change in the Constitution of the State, such would be the law applicable to his case. When the attention of the court is called to the proposition that if such effect is given to the change of the Constitution, it would, in this case, be liable to objection as an *ex post facto* law, the only answer is, that there is nothing in it, as the change is simply in a matter of procedure.

Whatever may be the essential nature of the change, it is one which, to the defendant, involves the difference between life and death, and the retroactive character of the change cannot be denied.

It is to be observed that the force of the argument for acquittal does not stand upon defendant's plea, nor upon its acceptance by the State's attorney, nor the consent of the court; but it stands upon the judgment and sentence of the court by which he is convicted of murder in the second degree, and sentence pronounced according to the law of that guilt, which was by operation of the same law an acquittal of the other and higher crime of murder charged in the same indictment.

It is sufficient for this case that the Supreme Court of Missouri, in the opinion we are examining, says it was so, and cites as authority for it the case of *State* v. *Ross*, 29 Mo. 32, in the same court; but counsel for plaintiff in error cites to the same

effect the cases of the *State* v. *Ball*, 27 Mo. 324; *State* v. *Smith*, 53 id. 139.

Blackstone says: " The plea of *autrefoits convict*, or a former conviction for the same identical crime, though no judgment was ever given, or, perhaps, will be (being suspended by benefit of clergy or other causes), is a good plea in bar to an indict- ment. And this depends upon the same principle as the former (that is, *autrefoits acquit*), that no man ought to be twice brought in danger of his life for one and the same crime. Hereupon it has been held that a conviction of manslaughter, on an appeal or indictment, is a bar even in another appeal, and much more in an indictment for murder; for the fact prose- cuted is the same in both, though the offences differ in coloring and degree." Bla. Com. Book 4, 336. See *State* v. *Norvell*, 2 Yerg. (Tenn.) 24; *Campbell* v. *The State*, 9 id. 333, 337.

This law, in force at the date of the homicide for which Kring is now under sentence of death, was changed by the State of Missouri between that time and his trial so as to deprive him of its benefit, to which he would otherwise have been entitled, and we are called on to decide whether in this respect, and as applied by the court to this case, it is an *ex post facto* law within the meaning of the Constitution of the United States.

There is no question of the right of the State of Missouri, either by her fundamental law or by an ordinary act of legisla- tion, to abolish this rule, and that it is a valid law as to all offences committed after its enactment. The question here is, Does it deprive the defendant of any right of defence which the law gave him when the act was committed so that as to that offence it is *ex post facto?*

This term necessarily implies a fact or act done, *after* which the law in question is passed. Whether it is *ex post facto* or not relates, in criminal cases, to which alone the phrase applies, to the time at which the offence charged was committed. If the law complained of was passed before the commission of the act with which the prisoner is charged, it cannot, as to that offence, be an *ex post facto* law. If passed after the commission of the offence, it is as to that *ex post facto*, though whether of the class forbidden by the Constitution may depend on other

matters. But so far as this depends on the *time* of its enactment, it has reference solely to the date at which the offence was committed to which the new law is sought to be applied. No other time or transaction but this has been in any adjudged case held to govern its *ex post facto* character.

In the case before us an argument is made founded on a change in this rule. It is said the new law in Missouri is not *ex post facto*, because it was in force when the plea and judgment were entered of guilty of murder in the second degree; thus making its character as an *ex post facto* law to depend, not upon the date of its passage as regards the commission of the offence, but as regards the time of pleading guilty. That, as the new law was in force when the conviction on that plea was had, its effect as to future trials in that case must be governed by that law. But this is begging the whole question; for if it was as to the offence charged an *ex post facto* law, within the true meaning of that phrase, it was *not* in force and could not be applied to the case, and the effect of that plea and conviction must be decided as though no such change in the law had been made.

Such, however, is not the ground on which the Supreme Court and the Court of Appeals placed their judgment.

"There is nothing," say they, "in this; the change is a change not in crimes, but in criminal procedure, and such changes are not *ex post facto*."

Before proceeding to examine this proposition, it will be well to get some clear perception of the purpose of the convention which framed the Constitution in declaring that no State shall pass any *ex post facto* law.

It was one of the objections most seriously urged against the new constitution by those who opposed its ratification by the States, that it contained no formal Bill of Rights. Federalist, No. lxxxiv. And the State of Virginia accompanied her ratification by the recommendation of an amendment embodying such a bill. 3 Elliot's Debates, 661.

The feeling on this subject led to the adoption of the first ten amendments to that instrument at one time, shortly after the government was organized. These are all designed to operate as restraints on the general government, and most of

them for the protection of private rights of persons and property. Notwithstanding this reproach, however, there are many provisions in the original instrument of this latter character, among which is the one now under consideration.

So much importance did the convention attach to it, that it is found twice in the Constitution, first as a restraint upon the power of the general government, and afterwards as a limitation upon the legislative power of the States. This latter is the first clause of section 10 of article 1, and its connection with other language in the same section may serve to illustrate its meaning. "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make anything but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts; or grant any Title of Nobility."

It will be observed that here are grouped contiguously a prohibition against three distinct classes of retrospective laws; namely, bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts. As the clause was first adopted, the words concerning contracts were not in it, because it was supposed that the phrase *ex post facto* law included laws concerning contracts as well as others. But it was ascertained before the completion of the instrument that this was a phrase which, in English jurisprudence, had acquired a signification limited to the criminal law, and the words "or law impairing the obligation of contracts" were added to give security to rights resting in contracts. 2 Bancroft's History of the Constitution, 213.

Sir Thomas Tomlin, in that magazine of learning, the English edition of 1835 of his Law Dictionary, says:—

"*Ex post facto* is a term used in the law, signifying something done after, or arising from or to affect another thing that was committed before."

"An *ex post facto* law is one which operates upon a subject not liable to it at the time the law was made."

The first case in which this court was called upon to construe this provision of the Constitution was that of *Calder* v. *Bull*, 3 Dall. 386, decided in 1798. The opinion was delivered

by Mr. Justice Chase, and its main purpose was to decide that the provision had no application to acts concerning civil rights. It, however, is important, as it discusses very fully the meaning of the provision in its application to criminal cases. It defines four distinct classes of laws embraced by the clause. " 1st, Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action. 2d, Every law that aggravates the crime or makes it greater than it was when committed. 3d, Every law that changes the punishment and inflicts a greater punishment than was annexed to the crime when committed. 4th, Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence in order to convict the offender." Again he says : " But I do not consider any law *ex post facto*, within the prohibition, that mollifies the rigor of the criminal law ; but only these that create or aggravate the crime ; or increase the punishment or change the rules of evidence for the purpose of conviction."

In the case before us the Constitution of Missouri so changes the rule of evidence, that what was conclusive evidence of innocence of the higher grade of murder when the crime was committed, namely, a judicial conviction for a lower grade of homicide, is not received as evidence at all, or, if received, is given no weight in behalf of the offender. It also changes the punishment, for, whereas the law as it stood when the homicide was committed was that, when convicted of murder in the second degree, he could never be tried or punished by death for murder in the first degree, the new law enacts that he may be so punished, notwithstanding the former conviction.

But it is not to be supposed that the opinion in that case undertook to define, by way of exclusion, all the cases to which the constitutional provision would be applicable.

Accordingly, in a subsequent case tried before Mr. Justice Washington, he said, in his charge to the jury, that " an *ex post facto* law is one which, in its operation, makes that criminal which was not so at the time the action was performed ; or which increases the punishment, *or, in short, which, in relation to the offence or its consequences, alters the situation of*

*a party to his disadvantage."  United States* v. *Hall*, 2 Wash.
366.

He adds, by way of application to that case, which was for
a violation of the embargo laws: " If the enforcing law applies
to this case, there can be no doubt that, so far as it *takes away
or impairs the defence* which the law had provided the defendant
at the time when the condition of this bond became forfeited,
it is *ex post facto* and inoperative."

This case was carried to the Supreme Court and the judg-
ment affirmed.  6 Cranch, 171.

The new Constitution of Missouri does take away what, by
the law of the State when the crime was committed, was a
good defence to the charge of murder in the first degree.

In the subsequent cases of *Cummings* v. *The State of Missouri*
and *Ex parte Garland*, 4 Wall. 277, 333, this court held that
a law which excluded a minister of the gospel from the exer-
cise of his clerical function, and a lawyer from practice in the
courts, unless each would take an oath that they had not
engaged in or encouraged armed hostilities against the govern-
ment of the United States, was an *ex post facto* law, because it
punished, in a manner not before punished by law, offences
committed before its passage, and because it instituted a new
rule of evidence in aid of conviction.  This court was divided
in that case, the minority being of opinion that the act in
question was not a crimes act, and inflicted no punishment,
in the judicial sense, for any past crime, but they did not con-
trovert the proposition that if the act had that effect it was
an *ex post facto* law.

In these cases we have illustrations of the liberal construc-
tion which this court, and Mr. Justice Washington in the
Circuit Court, gave to the words *ex post facto* law, — a con-
struction in manifest accord with the purpose of the constitu-
tional convention to protect the individual rights of life and
liberty against hostile retrospective legislation.

Nearly all the States of the Union have similar provisions in
their constitutions, and whether they have or not, they all
recognize the obligatory force of this clause of the Federal
Constitution on their legislation.

A reference to some decisions of those courts will show the

same liberality of construction of the provision, many of·them going much farther than is necessary to go in this case to show the error of the Missouri courts.

In *Commonwealth* v. *McDonough*, 13 Allen (Mass.), 581, it was held that a law passed after the commission of the offence of which the defendant stood charged, which mitigated the punishment, as regarded the fine and the maximum of imprisonment that might be inflicted, was an *ex post facto* law as to that case, because the minimum of imprisonment was made three months, whereas before there was no minimum limit to the court's discretion. This slight variance in the law was held to make it *ex post facto* and void as to that case, though the effect of the decision was to leave *no* law by which the defendant could be punished, and he was discharged, though found guilty of the offence.

In *Hartung* v. *The People*, 22 N. Y. 95, after the prisoner had been convicted of murder and sentenced to death, and while her case was pending on appeal, the legislature of that State changed the law for the punishment of murder in general, so as to authorize the governor to postpone indefinitely the execution of the sentence of death, and to keep the party confined in the penitentiary at hard labor until he should order the full execution of the sentence or should pardon or commute it.

The Court of Appeals held that, while this later law repealed all exi·ting punishments for murder, it was *ex post facto* as to that case, and could not be applied to it. This was decided in face of the fact that it resulted in the discharge of a convicted murderess without any punishment at all.

Denio, J., in delivering the opinion of the court, makes these excellent observations : —

" It is highly probable that it was the intention of the legislature to extend favor rather than increased severity towards the convict and others in her situation ; and it is quite likely that, had they been consulted, they would have preferred the application of this law to their cases rather than that which existed when they committed the offences of which they are convicted. But the case cannot be determined on such considerations. No one can be criminally punished in this country,

*except according to a law prescribed for his government before the supposed offence was committed, and which existed as a law at that time.* It would be useless to speculate upon the question whether this would be so upon the reason of the thing, and according to the spirit of our legal institutions, because the rule exists in the form of an express written precept, the binding force of which no one disputes. No State shall pass any *ex post facto* law is the mandate of the Constitution of the United States."

This is reaffirmed by the same court in the cases of *Shepherd* v. *People*, 25 N. Y. 406; *Green* v. *Shumway*, 39 id. 418; and *In re Petty*, 22 Kan. 477, decides the same thing. In *State* v. *Keith*, 63 N. C. 140, the Supreme Court of North Carolina held that a law repealing a statute of general amnesty for offences arising out of the rebellion was *ex post facto* and void, though both statutes were passed after the acts were committed with which the defendant was charged.

In *State* v. *Sneed*, 25 Tex. Supp. 66, the court held that in a criminal case barred by the Statute of Limitations, a subsequent statute which enlarged the time necessary to create a bar was, as to that case, an *ex post facto* law, and it could not be supposed to be intended to apply to it.

When, in answer to all this evidence of the tender regard for the rights of a person charged with crime under subsequent legislation affecting those rights, we are told that this very radical change in the law of Missouri to his disadvantage is not subject to the rule because it is a change, not in crimes, but in criminal procedure, we are led to inquire what that court meant by criminal procedure.

The word "procedure," as a law term, is not well understood, and is not found at all in Bouvier's Law Dictionary, the best work of the kind in this country. Fortunately a distinguished writer on Criminal Law in America has adopted it as the title to a work of two volumes. Bishop on Criminal Procedure. In his first chapter he undertakes to define what is meant by procedure. He says: "S. 2. The term 'procedure' is so broad in its signification that it is seldom employed in our books as a term of art. It includes in its meaning whatever is embraced by the three technical terms, Pleading, Evidence, and Prac-

tice." And in defining Practice, in this sense, he says: "The word means those legal rules which direct the course of proceeding to bring parties into the court and the course of the court after they are brought in;" and Evidence, he says, as part of procedure, "signifies those rules of law whereby we determine what testimony is to be admitted 'and what rejected in each case, and what is the weight to be given to the testimony admitted."

If this be a just idea of what is intended by the word "procedure" as applied to a criminal case, it is obvious that a law which is one of procedure may be obnoxious as an *ex post facto* law, both by the decision in *Calder* v. *Bull*, 3 Dall. 386, and in *Cummings* v. *The State of Missouri*, 4 Wall. 277; for in the former case this court held that "any law which alters the legal rules of evidence, and receives less or different testimony than the law requires at the time of the commission of the offence, in order to convict the offender," is an *ex post facto* law; and in the latter, one of the reasons why the law was held to be *ex post facto* was that it changed the rule of evidence under which the party was punished.

But it cannot be sustained without destroying the value of the constitutional provision, that a law, however it may invade or modify the rights of a party charged with crime, is not an *ex post facto* law, if it comes within either of these comprehensive branches of the law designated as Pleading, Practice, and Evidence.

Can the law with regard to bail, to indictments, to grand juries, to the trial jury, all be changed to the disadvantage of the prisoner by State legislation after the offence was committed, and such legislation not held to be *ex post facto* because it relates to procedure, as it does according to Mr. Bishop?

And can any substantial right which the law gave the defendant at the time to which his guilt relates be taken away from him by *ex post facto* legislation, because, in the use of a modern phrase, it is called a law of procedure? We think it cannot.

Some light may be thrown upon this branch of the argument by a recurrence to a few of the numerous decisions of the highest courts construing the associated phrase in the same sentence

of the Constitution which forbids the States to pass any law impairing the obligation of contracts. It has been held that this prohibition also relates exclusively to laws passed after the contract is made, and its force has been often sought to be evaded by the argument that laws are not forbidden which affect only the *remedy*, if they do not change the nature of the contract, or act directly upon it.

The analogy between this argument and the one concerning laws of procedure in relation to the contiguous words of the Constitution is obvious. But while it has been held that a change of remedy made after the contract may be valid, it is only so when there is substituted an adequate and sufficient remedy by which the contract may be enforced, or where such remedy existed and remained unaffected by the new law. *Tennessee* v. *Sneed*, 96 U. S. 69.

On this point it has been held that laws are void enacted after the date of the contract : —

1. Which give the debtor a longer stay of execution after judgment. *Blair* v. *Williams*, 4 Litt. (Ky.) 34; *McKinney* v. *Carroll*, 5 Mon. (Ky.) 96.

2. Which require on a sale of his property under execution an appraisement, and a bid of two-thirds the value so ascertained. *Bronson* v. *Kinzie*, 1 How. 311; *McCracken* v. *Hayward*, 2 id. 608 ; *Sprott* v. *Reid*, 3 Greene (Iowa); 489.

3. Which allow a period of redemption after such sale. *Lapsley* v. *Brashears*, 4 Litt. (Ky.) 47; *Cargill* v. *Power*, 1 Mich. 369; *Robinson* v. *Howe*, 13 Wis. 341.

4. Which exempt from sale under judgment for the debt a larger amount of the debtor's property than was exempt when the debt was contracted. *Edwards* v. *Kearzey*, 96 U. S. 595, and the cases there cited; Story's Commentary on the Constitution, sect. 1385.

There are numerous similar decisions showing that a change of the law which hindered or delayed the creditor in collecting his debt, though it related to the remedy or mode of procedure by which it was to be collected, impaired the obligation of the contract within the meaning of the Constitution.

Why is not the right to life and liberty as sacred as the right growing out of a contract? Why should not the contig-

uous and associated words in the Constitution, relating to re-
troactive laws, on these two subjects, be governed by the same
rule of construction? And why should a law, equally inju-
rious to the rights of the party concerned, be under the same
circumstances void in one case and not in the other?

But it is said that at the time the prisoner pleaded guilty of
murder in the second degree, and at the time he procured the
reversal of the judgment of the criminal court on that plea,
the new constitution was in force, and he was bound to know
the effect of the change in the law on his case.

We do not controvert the principle that he was bound to
know and take notice of the law. But as regards the effect of
the plea and the judgment on it, the Constitution of Missouri
made no change.

It still remained the law of Missouri, as it is the law of
every State in the Union, that so long as the judgment ren-
dered on that plea remained in force, or after it had been exe-
cuted, the defendant was liable to no further prosecution for
any charge found in that indictment.

Such was the law when the crime was committed, such was
the law when he pleaded guilty, such is the law now in Mis-
souri and everywhere else. So that, in pleading guilty under
an agreement for ten years' imprisonment, both he and the
prosecuting attorney and the court all knew that the result
would be an acquittal of all other charges but that of murder
in the second degree.

Did he waive or annul this acquittal by prosecuting his
writ of error? Certainly not by that act, for if the judgment
of the lower court sentencing him to twenty-five years' impris-
onment had been affirmed, no one will assert that he could
still have been tried for murder in the first degree. Nor
was there anything else done by him to waive this acquit-
tal. He refused to withdraw his plea of guilty. It was
stricken out by order of the court against his protest. He re-
fused then to plead not guilty, and the court in like manner,
against his protest, ordered a general plea of not guilty to be
filed. He refused to go to trial on that plea, and the court
forced him to trial.

The case rests, then, upon the proposition that, having an

erroneous sentence rendered against him on the plea accepted by the court, he could only take the steps which the law allowed him to reverse that sentence at the hazard of subjecting himself to the punishment of death for another and a different offence of which he stood acquitted by the judgment of that court.

That he prosecuted his legal right to a review of that sentence with a halter around his neck, when, if he succeeded in reversing it, the same court could tighten it to strangulation, and if he failed, it did him no good. 'And this is precisely what has occurred. His reward for proving the sentence of the court of twenty-five years' imprisonment (not its judgment on his guilt) to be erroneous, is that he is now to be hanged instead of imprisoned in the penitentiary. No such result could follow a writ of error before, and as to this effect the new constitution is clearly *ex post facto*. The whole error, which results in such a remarkable conclusion, arises from holding the provision of the new constitution applicable to this case, when the law is *ex post facto* and inapplicable to it.

If Kring or his counsel were bound to know the law when they prosecuted the writ of error, they were bound to know it as we have expounded it. If they knew that by the *words* of the new constitution such a judgment of acquittal as he had when he undertook to reverse it would be no longer an acquittal after it was reversed, they also knew that, being as to his case an *ex post facto* law, it could have no such effect on that judgment.

We are of opinion that any law passed after the commission of an offence which, in the language of Mr. Justice Washington, in *United States* v. *Hall,* "in relation to that offence, or its consequences, alters the situation of a party to his disadvantage," is an *ex post facto* law; and in the language of Denio, J., in *Hartung* v. *The People,* "No one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority before the imputed offence was committed, and which existed as a law at the time."

Tested by these criteria, the provision of the Constitution of Missouri which denies to plaintiff in error the benefit which the previous law gave him of acquittal of the charge of murder in the first degree, on conviction of murder in the second

degree, is, as to his case, an *ex post facto* law within the mean-
ing of the Constitution of the United States, and for the error
of the Supreme Court of Missouri, in holding otherwise, its
judgment will be reversed, and the case remanded to it, with
direction to reverse the judgment of the Criminal Court of St.
Louis, and for such further proceedings as are not inconsistent
with this opinion ; and it is

*So ordered.*

MR. JUSTICE MATTHEWS, with whom concurred MR. CHIEF
JUSTICE WAITE, MR. JUSTICE BRADLEY, and MR. JUSTICE
GRAY, dissenting.

The Chief Justice, Mr. Justice Bradley, Mr. Justice Gray,
and myself are unable to concur in the judgment and opinion
of the court in this case, and the importance of the question
determined constrains us to state the grounds of our dissent.
The material facts are these : The plaintiff in error, at March
Term, 1875, of the St. Louis Criminal Court, was indicted for
murder in the first degree. On his arraignment he pleaded
" not guilty." At the November Term of the same year a trial
was had, which resulted in a verdict of guilty of murder in
the first degree, and a sentence of death. That judgment was
reversed on appeal, and twice subsequently there were mis-
trials. On Nov. 12, 1879, the defendant, by consent of the
circuit attorney and leave of the court, withdrew his plea of
not guilty and entered a plea of guilty of murder in the second
degree. He was thereupon sentenced to imprisonment in the
penitentiary for a term of twenty-five years. The prisoner
then filed a motion to set aside this judgment and sentence,
and to allow him to withdraw the plea of guilty of murder in
the second decree and to permit him " to have his original plea
of not guilty entered of record to the end that he may have a
trial upon the merits of his case before a jury." In support of
this motion reasons were assigned, in substance, that he had
withdrawn his original plea of not guilty and entered the plea
of guilty of murder in the second degree, upon the faith of an
understanding previously had with the circuit attorney repre-
senting the prosecution, that if he would do so the sentence
should not exceed ten years in the penitentiary, which under-

standing was violated. by the sentence complained of. The
court overruled the motion, but on appeal the judgment was
reversed on the. ground alleged by the prisoner, that he had
been misled, and the cause was remanded for further proceed-
ings.   On receipt of this mandate, the trial court, the prisoner
refusing to withdraw his plea of guilty of. murder in the second
degree and to enter a plea of not guilty, entertained the motion
previously made by him, for refusing to grant which the judg-
ment had thus been reversed, and granted it, setting aside the
plea of guilty; and; the prisoner standing mute, ordered a plea
of not guilty to be entered.   On this plea a trial was had. at
October Term, 1881, when he was found guilty of murder in
the first degree and again sentenced to death.   An appeal was
prosecuted from this. judgment, which, however, was affirmed
by the Supreme. Court of Missouri, and is brought here for
examination by the present writ of error, on the ground that
it has been rendered in violation of a right secured to him by
the Constitution of the United States.

The right which it is alleged has been violated is supposed
to arise in this way.   At the time of the commission. of the
offence in 1875, it was well established as the law of Missouri,
by the decisions of the Supreme Court of the State, that
" when a person is indicted for murder in the first degree, and
is put upon his trial and convicted of murder in the second
degree and a new trial is ordered at his instance, he cannot
legally be put upon his trial again for the charge of murder in
the first degree; he can be put upon his trial only upon the
charge of murder in the second degree." *State* v. *Ross*, 29
Mo. 32; *State* v. *Smith*, 53 id. 139.   And it is not denied
that a plea of guilty of murder in the second degree, accepted
by the State, would have been at that time equally an acquittal
of the charge of murder in the first degree, having the same
force as to future trials as a conviction of murder in the second
degree, although the judgment should be reversed on the ap-
plication of the prisoner.

On Nov. 30, 1875, the State of Missouri adopted a new con-
stitution, which contained (sect. 23, art. 2) the provision, that,
" if judgment on a verdict of guilty be reversed for error in
law, nothing herein contained shall prevent a new trial of the

prisoner on a proper indictment, or according to correct principles of law."

In the case of *State* v. *Simms*, 71 Mo. 538, it was decided that this provision overthrows the rule laid down in the case of *State* v. *Ross, ubi supra,* and was " equivalent to declaring that when such judgment is reversed for error at law, the trial had is to be regarded as a mistrial, and that the cause, when remanded, is put on the same footing as a new trial, as if the cause had been submitted to a jury, resulting in a mistrial by the discharge of the jury in consequence of their inability to agree on a verdict."

The rule thus introduced by the Constitution of 1875 was the one applied in the trial of the prisoner, instead of that previously in force; and the contention is, that to apply it in a case such as the present, where the alleged offence was committed prior to the adoption of the new constitution, is to give it operation as an *ex post facto* law, in violation of the prohibition of the Constitution of the United States.

In examining this proposition it must constantly be borne in mind, that the plea of guilty of murder in the second degree, the legal effect of which, when admitted, is the precise subject of the question, was entered long after the new rule established by the Constitution of Missouri took effect; that the prisoner himself moved to set it aside, and for leave to renew his plea of not guilty, on the ground that he had been misled into making his plea of guilty under circumstances that would make it operate as a fraud upon his rights, if it were permitted to stand ; and that, because the court denied this motion, he made and prosecuted his appeal for a reversal of its judgment, in full view of the rule, then in force, of the application of which he now complains, which expressly declared what should be the effect of such a reversal.

The classification of *ex post facto* laws first made by Mr. Justice Chase, in *Calder* v. *Bull,* 3 Dall. 386, 390, seems to have been generally accepted.  It is as follows: " 1st, Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action.  2d, Every law that aggravates a crime or makes it greater than it was when committed.  3d, Every law that

changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed. 4th, Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender." This definition was the basis of the opinion of the court in *Cummings* v. *The State of Missouri*, 4 Wall. 277, and *Ex parte Garland*, id. 333, and was expressly relied on in the opinion of the dissenting judges, which says: "This exposition of the nature of *ex post facto* laws has never been denied, nor has any court or any commentator on the Constitution added to the classes of laws here set forth, as coming within that clause of the organic law." p. 391.

Now, under which of these heads does the controverted rule of the Missouri Constitution fall? It cannot be contended that it is embraced in either of the first three. If in any, it must be covered by the fourth. But what rule of evidence, existing at the time of the commission of the offence, is altered to the disadvantage of the prisoner? The answer made is this: that, at that time, an accepted plea of guilty of murder in the second degree was conclusive proof that the prisoner was not guilty of murder in the first degree, and that it was abrogated, so as to deprive the prisoner of the benefit of it. But while that rule was in force, the prisoner had no such evidence of which he could avail himself. How, then, has he been deprived of any benefit from it? He had not, during the period while the rule was in force, entered any plea of guilty of murder in the second degree, and no such plea had been admitted by the State. All that can be said is, that if, while the rule was in force he had entered such a plea with the consent of the State, its legal effect would have been as claimed, and by its change he has lost what advantage he would have had in such a contingency. But it does not follow that such a contingency would have happened. It was not within the power of the prisoner to bring it about, for it required the concurrence and consent of the State; and it cannot be assumed that, under such a rule and in such a case, that consent would have been given. It is not enough to say that, under a ruling of the court, a party might have lost the benefit of certain evidence,

if such evidence had existed. To predicate error in such a case, it must be shown that the party had evidence of which, in fact, he has been illegally deprived. Such a case would have been presented here, if the plea of guilty of murder in the second degree had been entered and accepted before the Constitution of 1875 took effect and while the old rule was in force. Then the law would have taken effect upon the transaction between the prisoner and the prosecution, in the acceptance of his plea; the *status* of the prisoner would have been fixed and declared; he would have stood acquitted of record of the charge of murder in the first degree; and the new rule would have been an *ex post facto* law if it had made him liable to conviction and punishment for an offence of which by law he had been declared to be innocent.

But, in the circumstances of the present case, the evidence, of which it is said the prisoner has been deprived, came into being after the law had been changed. It was evidence created by the law itself, for it consists simply in a technical inference; and the law in force when it was created necessarily determines its quality and effect. That law did not operate upon the offence to change its character; nor upon its punishment to aggravate it; nor upon the evidence which, according to the law in force at the time of its commission, was competent to prove or disprove it. It operated upon a transaction between the prisoner and the prosecution, which might or might not have taken place; which could not take place without mutual consent; and when it did take place, that consent must be supposed to have been given by both with reference to the law as it then existed, and not with reference to a law which had then been repealed.

It is the essential characteristic of an *ex post facto* law that it should operate retrospectively, so as to change the law in respect to an act or transaction already complete and past. Such is not the effect of the rule of the Constitution of Missouri now in question. As has been shown, it does not, in any particular, affect the crime charged, either in its definition, punishment, or proof. It simply declares what shall be the legal effect, in the future, of acts and transactions thereafter taking place. It enacts that any future erroneous and unlaw-

ful conviction for a less offence, thereafter reversed on the application of the accused, shall be held for naught, to all intents and purposes, and shall not, after such reversal, operate as a technical acquittal of any higher grade of crime, for which there might have been a conviction under the same indictment. It imposes upon the prisoner no penalty or disability. It cannot affect the case of any individual, except upon his own request, for he must take the first step in its application. When he pleads guilty of murder in the second degree, he knows that its acceptance cannot operate as an acquittal of the higher offence. When he asks to have the conviction reversed, he understands that if his application is granted, the judgment must be set aside with the same effect as if it had never been rendered. It does not touch the substance or merits of his defence, and is in itself a sensible and just rule in criminal procedure.

And, " so far as mere modes of procedure are concerned," says Judge Cooley, Const. Lim. 272, " a party has no more right in a criminal than in a civil action to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts, in existence when its facts arose. The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime. Statutes giving the government additional challenges, and others which authorized the amendment of indictments, have been sustained and applied to past transactions, as doubtless would be any similar statute calculated merely to improve the remedy, and in its operation working no injustice to the defendant and depriving him of no substantial right." Accordingly it was held by this court, in *Gut* v. *The State*, 9 Wall. 35, in the language of Mr. Justice Field, delivering its opinion, that " a law changing the place of trial from one county to another

county in the same district, or even to a different district from that in which the offence was committed or the indictment found, is not an *ex post facto* law, though passed subsequent to the commission of the offence or the finding of the indictment." And in the case of *Ex parte McCardle*, 7 Wall. 506, it was the unanimous decision of the court, that it was competent for Congress, in a case affecting personal liberty, to deprive the complaining party of the benefit of an appeal from the judgment of an inferior court, after his appeal had taken effect and while it was pending. It would have been equally competent for the Constitution of Missouri to have declared that no appeal or writ of error should thereafter be allowed to reverse the judgment of the court of original jurisdiction in any pending criminal cause, which certainly would be giving a different, because irreversible, effect to that judgment from what such judgments would have had under the law in force when the offence was committed. If it be true, in the logic of the law, as it is in all its other applications, that the greater includes the less, then it was competent for that constitution to provide that, as to all judgments in criminal cases thereafter rendered, which should be reversed for error, on the appeal of the defendant, the effect of the reversal should be such as not to be a bar to a subsequent conviction for any crime described in the indictment; for that would have been to say, not that there shall be no appeal at all, but that if an appeal is taken its effect shall only be such as is prescribed in the law allowing it.

In *Commonwealth* v. *Holley*, 3 Gray (Mass.), 458, Shaw, C. J., said: " The object of the Declaration of Rights was to secure substantial privileges and benefits to parties criminally charged; not to require particular forms, except where they are necessary to the purposes of justice and fair dealing towards persons accused, so as to insure a full and fair trial." And in *Commonwealth* v. *Hall*, 97 Mass. 570, the court, speaking of a statutory provision authorizing the amendment of indictments, so as to allege a former conviction, the effect of which was to increase the penalty, said: " We entertain no doubt of the constitutionality of this section, which promotes the ends of justice by taking away a purely technical objection, while

it leaves the defendant fully and fairly informed of the nature of the charge against him, and affords him ample opportunity for interposing every meritorious defence.   Technical and formal objections of this nature are not constitutional rights." These observations, it is not necessary to point out, are entirely applicable to the present argument.

Still stronger and more to the point is what was said by Shaw, C. J., in *Jacquins* v. *Commonwealth*, 9 Cush. (Mass.) 279, where it was held that a statute authorizing the Supreme Judicial Court, on a writ of- error, on account of error in the sentence, to render such judgment therein as should have been rendered, applied to past judgments, and was not, on that account, an *ex post facto* law.   That eminent judge said : " It was competent for the legislature to take away writs of error altogether, in cases where the irregularities are formal and technical only, and to provide that no judgment should be reversed for such cause.   It is more favorable to the party to provide that he may come into court upon, the terms allowed by this statute, than to exclude him altogether.   This act operates like the act of limitations.   Suppose an act was passed that no writ of error should be taken out after the lapse of a certain period.   It is contended that such an act would be unconstitutional, on the ground that the right of the convict to have his sentence reversed upon certain conditions had once vested. But this argument overlooks entirely the well-settled distinction between rights and remedies."

Precisely the same distinction between laws *ex post facto* and those which merely affect the remedy, and are, therefore, applicable to the case of an offence previously committed, is well illustrated by the case of *Ratzky* v. *The People*, 29 N. Y. 124.   There the prisoner had been convicted of murder in the first degree ; the offence was committed when the act of 1860 was in force, which prescribed the mode of punishment ; he was sentenced, however, in accordance with the terms of an act passed in 1862, subsequently to the commission of the offence, and which prescribed a different mode of punishment.   On this account the judgment was held to be erroneous and was reversed, on the ground that the act of 1862, applied to offences previously committed, was *ex post facto*.   But at the

time of the commission of the offence, in 1861, it was the well-settled law of New York, as decided in *Shepherd* v. *The People*, 25 N. Y. 406, that when a wrong judgment had been pronounced, although the trial and conviction were regular, the prisoner could not, on reversal of the judgment, be subject to another trial, but would be entitled to his discharge. But, on April 24, 1863, after the prisoner had been tried and convicted, but before judgment and sentence were pronounced, an act of the legislature took effect, which provided that the appellate court should have power, upon any writ of error, when it should appear that the conviction had been legal and regular, to remit the record to the court in which such conviction had been had, to pass such sentence thereon as the appellate court should direct. But for the authority conferred by this act, the Court of Appeals stated that it would have had no power, upon reversal of the judgment of the Supreme Court, either to pronounce the appropriate judgment, or remit the record to the oyer and terminer to give such judgment; but, on the contrary, would have been obliged to have discharged him, the law not authorizing another trial. Nevertheless, the Court of Appeals gave effect to the act of 1863, reversed the judgment, and sent the record down with directions to sentence the prisoner to death, in accordance with the provisions of the act of 1860, holding that the act of 1863 was not an *ex post facto* law. And yet it deprived the prisoner of the benefit of a rule of law, in force at the time the offence was committed; viz., that if he should be erroneously sentenced and the judgment should be reversed, he would be entitled to be discharged and forever after protected against further prosecution for the same offence, as well as against any second judgment upon the same verdict.

This decision deserves particular consideration, for it involves the very question under discussion. At the time of the commission of his offence, and at the time of his trial and conviction, a rule of law in New York had been well established, that upon a reversal of judgment in a capital case, for error in the sentence, the prisoner was entitled to be discharged, and his former conviction, notwithstanding the reversal, was a conclusive defence upon any subsequent trial for the same offence. After trial and conviction a statute was passed which abrogated

that rule and declared that a subsequent reversal of judgment for error merely in the sentence should not have that effect, but that, even without a new trial, a new judgment might be entered upon the verdict. This gave to the verdict and to the subsequent proceeding an effect entirely different from what they would have had under the law as it stood at the time of the commission of the offence, and deprived the prisoner of the advantage of the rule then in force. After that statute took effect he prosecuted a writ of error and reversed the judgment for error in the sentence, and it was held that the effect of that reversal was determined by the law in force when it was rendered, and not by the law in force when the trial and verdict were had and when the offence was committed.

Davies, J., said, p. 132: "It would follow from these considerations and the authority of the case of *The People* v. *Shepherd*, 25 N. Y. 406, that a wrong judgment having been pronounced, although the trial and conviction were regular, this prisoner could not be subjected to another trial and would be entitled to his discharge. That would unquestionably be so but for the act of April 24, 1863. . . . In the present case that act became operative before the judgment and sentence were pronounced and given and before the writ of error was prosecuted to this court. It was, therefore, in force when the writ of error in this case was prosecuted, and its provisions are applicable to the duty imposed upon this tribunal by virtue of that proceeding. . . . But for the authority conferred upon this court by that statute it would have had no power, upon reversal of the judgment of the Supreme Court, either to pronounce the appropriate judgment or remit the record to the oyer and terminer to give such judgment."

And Denio, C. J., said: " The remaining question is, whether the judgment should be reversed and the prisoner discharged, according to the former rule, or the record be remitted to the oyer and terminer to pass a legal sentence upon the conviction. This latter course is now authorized by statute. Laws 1863, c. 226, p. 406. The conviction was legal and the sentence only was erroneous. The only question is, whether the act, having been passed after the conviction, though before judgment was given in the Supreme Court, could be applied to the

case. I am of opinion that it can be applied. The forms of judicial proceedings are under the control of the legislature." And the court accordingly, instead of ordering the prisoner to be discharged, according to the rule in force at the time the offence was committed, and even at the time of his trial and conviction, directed the record to be remitted to the Court of Oyer and Terminer with instructions to sentence him to suffer death for the crime of which he had been convicted.

The counterpart and complement of the decision in Ratzky's case are found in *Hartung* v. *The People.* There the prisoner had been convicted of murder and sentenced to death; but at the time the judgment was rendered the law in force at the time of the commission of the offence providing for its punishment had been repealed, and the repealing act substituted a different punishment. It was on this account adjudged to be an *ex post facto* law and void, and the judgment was reversed. 22 N. Y. 95. Subsequently the repealing act was itself repealed, and the former act in force when the offence was committed was restored. Then the prisoner was again tried, having pleaded a former conviction, but was found guilty and adjudged to suffer death in accordance with the law existing at the time the offence was committed. This judgment was thereupon reversed, and the prisoner ordered to be discharged, on the ground that the act restoring the law as it stood when the offence was committed was an *ex post facto* law, because at the time it was passed the prisoner had been adjudged to be legally free from punishment of any kind on account of her offence. 26 id. 167. The very point of the decision was, that while it was competent for the legislature to repeal the repealing act so that it could not thereafter be availed of, it could not destroy the effect of a judgment actually pronounced, while that act was in force. It is manifest that if in that case the prisoner had not been tried at all until after the law had been thus twice changed, she could not have claimed to have had the vested interest in the first repealing act, which was allowed to her in the judgment actually rendered when it was in force. It was because the subsequent law, if applied, would have changed the legal effect of that judgment, that it was adjudged to be an *ex post facto* law.

It was precisely upon this principle that the Supreme Court of North Carolina proceeded in the case of *State* v. *Keith*, 63 N. C. 140. There the prisoner, in custody on a charge of murder, moved for a discharge, on the ground that his offence was within the provisions of the amnesty act of 1866-67. This was admitted to be the case, but the motion was opposed on the ground that the amnesty act had been repealed. It was held that the effect of the pardon was, so far as the State was concerned, to destroy and entirely efface the previous offence, as if it had never been committed; and that to give to the repeal of the amnesty act the effect, as claimed, of reviving the offence, would make it an *ex post facto* law, making criminal that which, when it took effect, was not so, and taking from the prisoner his vested right to immunity.

But suppose in that case the provisions of the amnesty act had been conditional and not absolute, so that no one could plead its pardon unless he had taken certain formal preliminary steps to obtain the benefit of its terms, and that before the prisoner had done so the act had been repealed. Could it be claimed that in that event he had obtained a vested right to immunity, and that its repeal operated as an *ex post facto* law? Clearly not. And in reference to this case, it is also to be observed, that the fact, the legal character of which was changed by the subsequent law, was the fact of pardon, and not a fact which existed at the time of the commission of the offence. The repealing act was, *ex post facto*, because it had the effect to change the legal character of the facts as they existed at the time of its passage.

In *State* v. *Arlin*, 39 N. H. 179, a prisoner was indicted for a robbery, which at the time of its commission was punishable by imprisonment for life; but by the same law he was entitled to have counsel assigned him by the government, process to compel the attendance of witnesses, and other similar privileges. A subsequent law mitigated the severity of the punishment and repealed the act giving these privileges. It was held that the act was not *ex post facto*, because it changed the punishment to the advantage of the prisoner, and that he was not entitled to the incidental benefits secured by the law in force when the offence was committed. The court remarked, that

by committing the offence the prisoner had not acquired a vested right to enjoy the privileges to which he would have been entitled if tried under the law subjecting him to imprisonment for life.

The rule of law in Missouri, the benefit of which is claimed for the prisoner in this proceeding, notwithstanding its repeal by the Constitution of the State before it could have been applied in his case, was established, not by statute, but by a series of judicial decisions of the Supreme Court of the State. Those decisions might at any time have been reversed by the same tribunal, and a new rule introduced, such as that actually declared by the Constitution. In that event, could it be said, with any plausibility, that the later decisions, reversing the law as previously understood, could not be applied to all subsequent proceedings in cases where, upon a plea of guilty of murder in the second degree thereafter entered and accepted, an erroneous judgment thereon had been reversed, notwithstanding, when the offence was committed, the prior decisions had been in force? Would the new rule, as introduced and applied by the later judicial decisions, be in violation of the prohibition of the Constitution of the United States against *ex post facto* laws? But the Constitution of Missouri has done no more than this.

The nature and operation of the rule are not affected by any peculiarity in the authority which establishes it. If it is not objectionable as an *ex post facto* law, when introduced by judicial decision, it is because it is not so in its nature; and, if not, it does not become so when introduced by a legislative declaration.

There are doubtless many matters of mere procedure which are of vital consequence; but in respect to them the power of Congress, as to crimes against the United States, is restrained by positive and specific limitations, carefully inserted in the organic law, prohibiting unreasonable searches and seizures, and general warrants, providing that no one shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the military service; that no person shall, for the same offence, be twice put in jeopardy of life or limb, nor be compelled to testify against himself; that every accused person shall be secured in the right to a public trial by an impartial

jury in a previously ascertained district, in which the alleged offence is charged to have been committed; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence. But these are limitations upon the legislative power of the United States, whether prospective or retrospective, and not upon that of the States; and although the constitutions of all the States probably have equivalent guarantees of individual rights, the violation of none of them by a State tribunal, under State legislation, could present a case for the exercise of supervisory jurisdiction by this court. The prohibition against bills of attainder is the only one of this class which applies to both the government of the United States and those of the States; and while a bill of attainder may be an *ex post facto law*, it is not necessarily so, as it may be merely a matter of procedure, a trial by a legislative instead of a judicial body.

But, in addition to these matters of procedure, which are specially protected against legislative change, either for the past or the future, there may be others, in which changes with a retrospective effect are forbidden by the prohibition against *ex post facto* laws. Such, we have already seen, would be laws which authorize conviction upon less evidence than was required at the time of the commission of the offence, or which altered, to the disadvantage of the accused, the nature and quantity of proof at that time required to substantiate a legal defence; or which, in other words, gave to the circumstances which constituted and attended the act a legal signification more injurious to the accused than was attached to them by the law existing at the time of the transaction.

It is doubtless quite true that it is difficult to draw the line in particular cases beyond which legislative power over remedies and procedure cannot pass without touching upon the substantial rights of the parties affected, as it is impossible to fix that boundary by any general words. The same difficulty is encountered, as the same principle applies, in determining, in civil cases, how far the legislature may modify the remedy without impairing or enlarging the obligation of contracts. Every case must be decided upon its own circumstances, as the

question continually arises and requires an answer. But it is a familiar principle, that, before rights derived under public laws have become vested in particular individuals, the State, for its own convenience and the public good, may amend or repeal the law without just cause of complaint. "The power that authorizes or proposes to give," said Woodbury, J., in *Merrill* v. *Sherburne*, 1 N. H. 199, 213, "may always revoke before an interest is perfected in the donee." Accordingly the heir apparent loses no legal right if, before descent cast, the law of descents is changed so as to shift the inheritance to another, however his expectations may be disappointed. And while it would be a violation of the constitutional maxim which forbids retrospective legislation inconsistent with vested rights to deprive, by a repeal of statutes of limitation, a defendant of a defence which had become perfect while they were in force; yet if, before the bar had become complete, he should be deprived of an expected defence, by an extension of time in which suit might be brought, he would have no just cause to object that he was compelled to meet the case of his adversary upon its merits.

In respect to criminal offences it is undoubtedly a maxim of natural justice, embodied in constitutional provisions, that the quality and consequences of an act shall be determined by the law in force when it is committed, and of which, therefore, the accused may be presumed to have knowledge, so that the definition of the offence, the character and degree of its punishment, and the amount and kind of evidence necessary to prove it, cannot be changed to the disadvantage of the party charged, *ex post facto*. And this equally applies to, because it includes, the matters which, existing at the time and constituting part of the transaction, affect its character, and thus form grounds of mitigation or defence; for the accused is entitled to the benefit of all the circumstances that attended his conduct, according to their legal significance, as determined at the time. All these are incidents that belong to the substance of the thing charged as a crime, and therefore come within the saving which preserves the legal character of the principal fact. But matters of possible defence, which accrue under provisions of positive law, which are arbitrary and technical, introduced for public convenience or from motives of policy,

which do not affect the substance of the accusation or defence, and form no part of the *res gestæ*, are continually subject to the legislative will, unless, in the mean time, by an actual application to the particular case, the legal condition of the accused has been actually changed. His right to maintain that *status*, when it has become once vested, is beyond the reach of subsequent law.

The present, as we have seen, is not such a case. The substance of the prisoner's defence, upon the merits, has not been touched; no vested right under the law had wrought a result upon his legal condition before its repeal. He is, therefore, in no position to invoke the constitutional prohibition, which is, by the judgment of this court, now interposed between him and the crime of which he has been convicted.

In our opinion, the judgment of the Supreme Court of Missouri should be affirmed.