No. 13,630.

STATE OF LOUISIANA VS. PAUL LOUIS FOURCHY.

SYLLABUS.

ON THE EXCEPTIONS.

1.  To disbar an attorney, in a civil suit, for acts for which, when committed, he could have been disbarred only after trial and conviction in a criminal court, is to impose a punishment to which he was not liable when the acts were committed ; and the legislation authorizing it is subject to the inhibition in the Federal Constitution against the passage of bills of attainder and *ex post facto* laws.
2.  It is competent for the Legislature to change the method of procedure, and the forum by, and in, which particular cases are pending, or are to be tried, and a party interested has no just cause for complaint merely because such

change is made after his right of action, or a right of action against him, arises.

3. Actions to disbar attorneys are properly brought, since the adoption of the present Constitution, agreeably to the rule adopted by this court pursuant to the provisions of Article 85 of said Constitution and such actions are not to be tried by juries.

4. The attorney as against whom charges are made with a view to his disbarment is not entitled to be present at the sittings of the commission, created under the rule above mentioned, at which such charges are being investigated. Nor is the commission obliged to notify him before reaching its conclusion and certifying the same to the Attorney General.

5  The civil action to disbar as authorized by Act 129 of 1896, and as now authorized by the rule of this court adopted under the authority of the Constitution, is predicated upon the theory of the violation by an attorney of the special obligation assumed by him as a consideration for the issuance of his license. It is not, therefore, an action *ex delicto,* and not prescribed in one year.

### ON THE MERITS.

1. The "exclusive original jurisdiction in all maters touching professional misconduct of members of the bar," conferred on this court by Article 85 of the Constitution, does not extend to non-professional misconduct, which is cognizable originally in the District Courts, agreeably to the provisions of Act No. 129 of 1896.

2. Whilst the professional conduct of a member of the bar may be open to censure, it does not, of necessity, follow that the severe penalty of disbarment should be imposed.

3. In the instant case, the charge, which has been considered upon its merits, that the defendant practiced a fraudulent deception, whilst acting in his professional capacity, is not sustained by the evidence.

*Walter Guion,* Attorney General (*Henry Plauche Dart* and *Edwin Thomas Merrick,* of Counsel), for Plaintiff.

---

*Gustave V. Soniat,* for Defendant.

---

The opinion of the court on the exceptions was delivered by MONROE, J.

---

On the merits by MONROE, J.

---

### STATEMENT OF THE CASE.

MONROE, J. This is an original proceeding to disbar the defendant for professional misconduct. The petition alleges, in substance, that Article 85 of the present State Constitution confers on this court exclusive jurisdiction in all matters "touching professional misconduct of members of the bar, with power to disbar under such rules" as may

be adopted; that, under the authority thus conferred, this court, in June, 1898, amended its rules so as to create a commission of five lawyers and to impose upon said commission the duty of examining applicants for admission to the bar and of investigating complaints made against members of the bar touching professional misconduct; and, in the event of its finding probable cause for disbarment, making it the further duty of said commission to certify the same to the Attorney General, upon whom is imposed the obligation of filing in this court proceedings to disbar the offending attorney; it being also the duty of said commission to designate certain of its members to be associated with the Attorney General in such prosecution. The petition further alleges that the members of the commission so created accepted the trust and entered upon the duties thereof, and that charges having been made before them accusing Paul Louis Fourchy of professional misconduct, the facts supporting the same were investigated, with the result that the commission reached the conclusion that probable cause for disbarment existed and certified such conclusion to the Attorney General, who, in discharge of the obligations imposed upon him by the rule hereinbefore referred to, and by his oath of office, presents this petition, and charges—

That Paul Louis Fourchy was admitted to the bar of Louisiana March 28th, 1884, and took the oath, signed the roll of attorneys in this court and entered upon the practice of law.

That, as such attorney, he received, on or about April 5th, 1895, $1,163.73; on September 9th, 1895, $650.00; on July 31, 1896, $1,667.75, and that he embezzled said sums and was indicted therefor by the Grand Jury; "that on March 25th, 1898, the said Paul Louis Fourchy was indicted by the Grand Jury of the Parish of Orleans in suit No. 27,273 of the docket of the Criminal District Court, charging him with having embezzled the sum of three hundred dollars on May 18, 1895," and that, in December, 1898, said Fourchy, "as attorney for the succession of one J. M. Modtler and wife," under a pretense that he needed money to conduct a lawsuit, fraudulently induced John L. Modtler to sell certain real estate in the belief that he was merely mortgaging the same, and that said sale was thereafter annulled as fraudulent by judgment of the Civil District Court. Relator further alleges that "all or most" of said indictments were "nolle prossed," but that said Fourchy was, nevertheless, guilty of professional misconduct; that his actions have brought great scandal on the legal profession and the ad-

ministration of justice in this State, and that he should, therefore, be deprived of the right hereafter to practice law in Louisiana. The prayer is that, after citation and hearing, the said Fourchy be found guilty of gross professional misconduct and punished by disbarment and withdrawal of his license to practice law.

To this petition the defendant excepts upon the following grounds, to-wit:

1. That the petition discloses no cause or right of action.

2. That, as the petition alleges that the defendant has already been called upon to answer to all of the criminal charges mentioned, and as the same have been *nolle prosequied* by the State, the State is estopped with respect to the present prosecution, which is in violation of Article 9 of the Constitution of 1898; Article 5 of the Constitution of 1879, and Article 5 of the amendments to the Constitution of the United States.

3. That this court is without jurisdiction of an original proceeding in prosecution of an offense said to have been committed before the adoption of the Constitution of, 1898 and the rules adopted thereunder; that respondent's rights with respect to the trial of such offenses were fixed by Act 129 of 1896, and that a trial without a jury, and in the manner proposed, would be in violation of Article 7 of the amendments to the Constitution of the United States and of Article 1, Section 10, of said Constitution.

4. That the rules adopted by this court did not authorize an *ex parte* investigation by the committee created by the court, and that respondent had the constitutional right to be heard before said body before action affecting him was taken.

5. That the offenses mentioned in the petition are barred by the prescription of six and twelve months.

### OPINION.

The exception of "no cause or right of action" is founded, in the main, upon the theory that, in view of the prohibition in the Federal Constitution against the passage of bills of attainder and *ex post facto* laws, the defendant is not liable to be disbarred for the acts charged against him until he has first been convicted thereof by means of a criminal prosecution, and hence, that, in failing to allege such previous conviction, the petition fails to disclose either a cause or a right of action.

The generally accepted doctrine in England and in this country is that the power to disbar an attorney is possessed by and is inherent in all courts which have authority to admit attorneys to practice, and wherever there has been no legislation regulating the matter, it has, necessarily, been left to the courts to determine what manner of case should be made out in order to justify a judgment of that character.

In 1810 this court disbarred an attorney upon a charge of having fraternized with the negro insurrectionists in St. Domingo in 1793, before his admission to the bar here. Dormenon's Case, 1st M. 129. Thereafter, in 1823 and 1826, the General Assembly adopted certain legislation upon the subject of the disbarment of attorneys, which survives, in part, as Sections 119 and 120 of the Revised Statutes. Those sections, so far as it is necessary to quote them, read as follows, to-wit:

"Sec. 119. If any attorney at law shall recover any sum of money for his client and shall neglect or refuse to pay it over when demanded, without any legal ground for such refusal, he shall, on conviction, be immediately erased from the list of attorneys. * * *

"Sec. 120. If any attorney shall commit any fraudulent practice in any court of this State, or shall betray the interest confided to him by his client, he shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be stricken from the list of attorneys."

In the two cases arising under the dominion of this law it was held that an attorney's license could not be withdrawn and annulled unless on conviction "in a proceeding by information in a criminal court." Chevalon and Wife vs. Gustavus Schmidt, 11 R. 91; Turner vs. Walsh et al., 12 R. 363. And matters remained in that condition until July 9th, 1896, when Act No. 129 of the session of that year became a law. It reads as follows:

"That if any attorney at law in this State shall be convicted of any felony or shall be guilty of a gross professional misconduct, he may be summoned before the District Court * * * by a petition signed by not less than ten attorneys at law * * * setting forth * * * the felony of which he has been convicted or the professional misconduct complained of * * * and if, upon trial, the allegations of such petition shall be proven, the court shall proceed to render judgment reprimanding, suspending from practice or disbarring such attorney." * * *

This statute was brought here for construction in the case of State ex rel. Adams vs. Judge, 49 Ann. 1013, and it was held that it did

not have the effect of repealing the provisions of the Revised Statutes, but authorized a proceeding to disbar in the Civil Court as an additional means of accomplishing that result. Mr. Justice Miller, as the organ of the court, said:

"The Legislature, guided by the judicial interpretation that under existing legislation the attorney could be reached only by criminal proceedings for misconduct in his profession, it is clear to our minds, proposed to supply another method, by civil proceedings." And the application that the Civil District Court be prohibited from going on with the trial of the case begun under the authority of the Act of 1896, was accordingly denied. In the following year (May 12th, 1898) the present State Constitution was adopted. Article 85 of that instrument provides that the "Supreme Court * * * shall have exclusive original jurisdiction in all matters touching the professional misconduct of members of the bar, with power to disbar, under such rules as may be adopted by the court." And, with the view of carrying this provision into effect, this court, in June, 1898, adopted the following, as an amendment to its rules, to-wit: "That a commission of five lawyers shall be appointed, whose duty it shall be * * * and, in addition to those duties, said commission shall be charged with the special duty of investigating any complaints made against members of the bar touching professional misconduct; and, if said commission shall be of the opinion that a probable cause of disbarment exists against said member of the bar, the said commission shall certify the facts to the Attorney General of the State, and it shall thereupon be his duty to file in this court a suit to disbar the offending attorneys; and said bar commission shall designate one or more of its members to associate with and assist said Attorney General in the said prosecution. All of said proceedings shall be in the name of the State of Louisiana at the cost of the defendant, if condemned, otherwise without costs."

It is claimed that the present action has been brought agreeably to the provisions of the Constitution and of the rule thus adopted.

The defendant, as we have seen, is charged with having in his capacity of attorney embezzled three distinct sums of money, on April 5th and September 9th, 1895, and July 31st, 1896, respectively, and to have practiced a fraud of another kind in his said capacity in December, 1898.

With regard to one of his alleged offenses, the charge, as formulated

in the petition, is "That on March 25th, 1898, the said Paul Louis Fourchy was indicted by the Grand Jury of the Parish of Orleans in suit No. 27,275 of the docket of the Criminal District Court, charging him with having embezzled the sum of three hundred dollars on May 18th, 1895."

It is not alleged that the defendant embezzled the three hundred dollars referred to, but only that he was so charged by means of an indictment; nor is it alleged that he was indicted for having embezzled said sum in his capacity as an attorney, or that he was convicted of the embezzlement. Whether, therefore, this charge be considered with regard to the Revised Statutes, or the Act of 1896, or both, it sets forth no cause of action.

The offenses alleged to have been committed upon April 5th and September 9th, 1895, were, by reason of those dates, under the dominion of the law as contained in the Revised Statutes, as the only law applicable to the subject then in force; and the defendant claims that any law subsequently adopted, which would in its relation to said offenses have the effect of altering the situation to his disadvantage, or which undertakes to punish for acts already committed, is to that extent an *ex post facto* law, or a bill of attainder, and void.

It is claimed on behalf of the State that the Act of 1896 and the provisions of the present Constitution, taken in connection with the rule of court adopted pursuant thereto, as relates to the previously committed offenses, as well as to those subsequently committed, are competent exercises of the power to regulate procedure; and, moreover, that this being a civil suit, the provisions of the Federal Constitution upon the subject of *ex post facto* legislation are inapplicable.

It is well settled that a person accused of crime is not entitled, of right, to be tried in the exact mode, in all respects, that may be prescribed at the time of the commission of said crime, and that he is not entitled, of right, to be tried before the court having jurisdiction of the crime when committed, but that the Legislature may prescribe a new and different mode of procedure and vest jurisdiction in a new and different court. But it is equally well settled that the law making power cannot in the exercise of the authority to regulate the mode of procedure whereby and to determine the court wherein a crime shall be prosecuted deprive the accused of any substantial rights which he possessed when the crime was committed, or add anything to the burdens and penalties which were then imposed upon him with respect

thereto. This distinction was fully recognized in Kring vs. Missouri,
107 U. S. 331; Thompson vs. U. S., 170 U. S. 343; State vs. Ardoin,
51 Ann. 169, and numerous other cases, in which it was claimed that
the laws complained of were competent exercises of the authority to
regulate procedure, but in which the Supreme Court of the United
States and this court held that the claim was not well founded, and
that the laws in question, as sought to be applied, were incompetent
exercises of power, for the reason that, in regulating the procedure,
they altered the situation to the disadvantage of the accused and de-
prived him of substantial rights. There seems to be some force in the
contention that the law invoked by the plaintiff, if given the effect
claimed for it, will work a similar result. It purports to authorize
the disbarment of the defendant by means of a civil suit in addition
to the criminal prosecution already provided for the accomplishment
of that end; whereas, when the offenses with which the defendant is
charged are said to have been committed, he could only have been dis-
barred upon and after such conviction. No civil action at that time could,
therefore, have been maintained, save upon the basis of previous con-
viction, and hence, an exception of no cause of action must have pre-
vailed as against such civil action where the previous conviction was
not and could not have been alleged; and it results that, unless the
exception as herein filed is maintained, it must be for the reason that
a cause of action has been supplied by legislation, since no previous
conviction is or could be alleged. But the learned counsel for the
State say that, this being a civil proceeding, the provisions of the
Federal Constitution on the subject of *ex post facto* laws have no
application. Supposing this to be true, we have, nevertheless, this situ-
ation: In 1893, when the particular acts which we are now considering
are said to have been committed, they did not constitute a cause for
the disbarment of the defendant, save upon conviction in a Criminal
Court, but it is said that by virtue of legislation subsequently
adopted the defendant can now be disbarred for such acts by means of
the present civil action, without previous conviction. In other words,
it is claimed that under the legislation invoked he can be disbarred
for the acts, themselves, committed before the adoption of that legisla-
tion, though under the law in existence when such acts were committed
he could have been disbarred only upon being convicted of the
crime which those acts constituted. The principle involved is the same
as that which received consideration in the Supreme Court of the

United States in the cases of Cummings vs. Missouri, 71 U. S. (4 Wallace) 277; and *ex parte Garland, Ib.* 333, in which it was held that a bill of attainder is a legislative act which inflicts punishment without a judicial trial; that a law which imposes punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that prescribed is an *ex post facto* law, and that the constitutional inhibition against the adoption of such legislation applied to the cases of a priest, who was denied the right to preach and teach, and to a lawyer who was denied the right to practice his profession, because of acts which did not authorize such denial at the time they were committed. We take the following from the case last above mentioned, to-wit:

"Exclusions from any of the professions, or any of the ordinary avocations of life, for past conduct, can be regarded in no other light than as punishment for such conduct. All enactments of this kind are subject to the constitutional inhibition against the passage of bills of attainder, under which general designation they are included." These decisions, we think, correctly interpret the Constitution of the United States and are applicable to the particular branch of the instant case which is now under consideration. It may be remarked in this connection that, whilst to deprive a man of the right to practice his profession operates as a "punishment," and the word is used in the foregoing quotation in that sense, nevertheless, it is not the purpose of the action to disbar an attorney, that he should be punished, but merely that the court should thereby rid itself of an unworthy officer. Our conclusion, then, is that *quoad* the particular offenses now under consideration, the exception is well taken.

The date of the remaining charge of embezzlement is said to have been July 21, 1896, after the Act No. 129 of that year became a law. But the counsel for defendant claims that under said act, as under the provisions of the Revised Statutes, a conviction is a prerequisite to disbarment, where the offense charged amounts to a felony. The language of the act which is relied on as supporting this view, reads: "That if any attorney at law of this State shall be convicted of any felony, or shall be guilty of gross professional misconduct, he may be summoned," etc. There can be no doubt but that the embezzlement by an attorney of the funds of his client which come into the possession of such attorney is "gross professional misconduct," and unless that expression, as used in the act, is to be deprived of its principal value,

it must be held to include such embezzlement, and to include any other felony committed by an attorney in violation of specific professional obligations. Upon the other hand, the first paragraph of the act, it may reasonably be presumed, was intended to make it clear that an attorney who shall be convicted of "any" felony (i. e., whether committed in his character of attorney or otherwise) *may*, by reason of such conviction, be disbarred in a civil action—thus setting at rest the question of liability of attorneys for disbarment for misconduct amounting to felony which does not involve their professional obligations. This view of the matter is strengthened by reference to the adjudged cases, from which it appears that, whilst conviction is not a prerequisite to disbarment in case of a felony committed by an attorney, as such, there is some diversity of opinion as to whether it should or should not be so considered where the felony has no connection with the professional obligations of the attorney.

In *ex parte* Wall, 107 U. S. 265, the Supreme Court of the United States reviewed the English and American cases upon the subject, and stated the conclusion reached as follows, to-wit:

"The rule to be deduced from all the English authorities seems to be this: That an attorney will be struck off the roll if convicted of felony, or if convicted of a misdemeanor involving want of integrity, even though the judgment be arrested or reversed for error; and, also, without a previous conviction, if he is guilty of gross misconduct in his profession, or of any acts which, though not done in his professional capacity, gravely affect his character as an attorney; but in the latter case, if the acts charged are indictable, and are fairly denied, the court will not proceed against him until he has been convicted by the jury, and will in no case compel him to answer under oath to a charge for which he may be indicted. This rule has, in the main, been adopted by the courts of this country, though special proceedings are provided for by statute in some of the States, requiring a formal information under oath to be filed with regular proceedings and trial by jury."

    \*      \*      \*      \*      \*      \*      \*

"But, where the acts charged against an attorney are not done in his official capacity and are indictable and not confessed, there has been a diversity of practice on the subject, in some cases it being laid down that there must be a regular indictment and conviction before the court will proceed to strike him from the roll; in others, such previous conviction being deemed unnecessary."

In the course of the reasoning which led to these conclusions the authority of various judges and courts was cited, and among others the following, to-wit: "Lord Abinger said that as long as he had known Westminster Hall he had never heard of such a rule as that an attorney might not be struck off the roll for misconduct in a cause, merely because the offense imputed to him was of such a nature that he might have been indicted for it, but he said that in the case of an application calling upon an attorney to answer the matters of an affidavit he had known Lord Kenyon and Lord Ellenborough frequently to say, 'You cannot have a rule for this purpose because the misconduct you impute to the man is indictable, but you may have one to strike him off the roll.' "

We therefore conclude that in the adoption of the Act of 1896, whilst it was no doubt within the contemplation of the General Assembly that an attorney might be disbarred upon conviction of any felony, it was not intended to require such conviction in cases where the act charged amounts to gross professional misconduct as well as felony; and hence, that in charging the defendant with having in his professional capacity embezzled a sum of money, after the Act of 1896 became a law, the State sets forth a cause of action, though no previous conviction is alleged.

As to the "right" of action, the conclusion stated disposes of the question, in so far as concerns offenses charged as having been committed before the passage of the Act of 1896; since there being no cause of action with respect to such offenses, there can be no right of action. But with regard to offenses committed since the passage of the act, the case is different. It was competent for the General Assembly to authorize ten attorneys to bring suits to disbar, as was done in the Act of 1896, and we do not understand this proposition to be disputed. That being the case, it was equally competent for this court, acting under the direct grant of authority from the Constitution, to authorize such suits to be brought as the one now under consideration has been brought. This action, in so far as it affects the particular offense which the defendant is charged to have committed in July, 1896, between the date of the adoption of the Act of 1896 and that of the adoption of the Constitution, merely provides for the bringing of the suits in this court by the Attorney General, after a certain investigation and report by a committee of lawyers; whereas, the pre-existing law authorized the bringing of such suit by any ten attorneys residing

in the district, in the District Court of the defendant's domicile. This is in the nature of remedial legislation, which deprives the defendant of no substantial right and affords no just cause of complaint. Kring vs. Missouri, 107 U. S. 221; Cassard vs. Tracy, 52 Ann. 833.

It is said that the State is estopped to prosecute the suit by reason of the fact, set up in the petition, that the criminal prosecution for the offenses with which the defendant is here charged were all, or most all, of them *"nolle prossed."* We cannot concur in this view. It is not alleged that *all* the criminal prosecutions were *nolle prossed,* and, if they were, such action committed the State to nothing, so far as the questions presented in this suit are concerned.

## III.

It is said that *quoad* every offense alleged to have been committed after the passage of the Act of 1896 and before the adoption of the present Constitution, defendant is entitled to a trial by jury. In support of this claim, the learned counsel refers us to the language of the Act of 1896, which, after providing that any attorney at law who shall be convicted of felony or who shall be guilty of gross professional misconduct, may be summoned before the District Court by a petition, signed "by not less than ten attorneys," etc., proceeds thus: " Said attorney shall be cited to answer thereto, as in ordinary proceedings, and if, upon trial, the allegation of such petition shall be proven, the said court shall proceed to render judgment, reprimanding, suspending from practice, or disbarring," etc. It thus appears that the attorney is to be *cited,* as in ordinary cases, but, if, upon the trial, the allegations of the petition are proven, the sentence of the court follows immediately, and there is no suggestion that it is contingent upon the verdict of the jury. Nor can any good reason be conceived why it should be so since a method of disbarring attorneys by means of trials by jury has already been provided and is still in existence, and the purpose of the act of 1896 is to provide another method, more in consonance with the relations existing between attorneys and courts, which relations have been thus defined.

"They" (attorneys) "are officers of the court, admitted as such, by its order, upon evidence of their possessing sufficient legal learning and fair private character    *  .  *    *.   The order of admission is the judgment of the court that the parties possess the required qualifications as attorneys and are entitled to appear as such and conduct

causes therein. From its entry the parties became the officers of the court and are responsible to it for professional misconduct."

*Ex parte* Garland, 4th Wallace, 333.

We are, therefore, of opinion that the Act No. 129 of 1896 does not contemplate trial by jury, and we are equally of opinion that the rule adopted by this court, agreeably to Article 85 of the Constitution, with regard to the institution and prosecution of suits to disbar attorneys, does not contemplate that such suits should be tried by juries.

## IV.

The defendant makes the objection that he was not called before the commission appointed under the rule of this court and was not afforded an opportunity to be heard, and that he has thereby been deprived of certain constitutional rights. The answer to this seems to be that he is now afforded the opportunity which he desires. The investigation imposed upon the commission was merely for the purpose of determining whether a complaint should be made against the defendant, and it was optional with the commission to conduct that investigation as the members saw fit, just as it would have been optional with the ten attorneys mentioned in the Act of 1896 to consult together and bring suit without consulting the defendant, and just as it was optional with the Grand Jury to indict the defendant without having heard him. The grant of authority to this court, it will be remembered, comes direct from the Constitution, and the court is thereby vested with "exclusive original jurisdiction in all matters touching the professional misconduct of members of the bar, with power to disbar, under such rules as may be adopted by the court." Acting in the exercise of this authority, the court adopted the rule which has already been mentioned and under which the commission of lawyers was created and is discharging its functions. We are not convinced that the rule is unauthorized or unreasonable, and it is not claimed that the commission has gone beyond it. This objection is, therefore, not well taken.

## V.

The defendant pleads the prescription of six and twelve months declared by Section 986 of the Revised Statutes as amended by Act No. 50 of 1894. This prescription applies exclusively to criminal prosecutions, though, no doubt, if the right to maintain the present action depended wholly upon the result of criminal prosecutions for

the offenses with which the defendant is charged, and it appeared that such prosecutions were barred by prescription, the action, whether prescribed or not, would necessarily fall. But such is not the case. This proceeding is entirely independent of any criminal prosecution, and might have been instituted and may be maintained, although all such prosecutions, on account of the matters set forth in the petition, had been previously prescribed. As was said in the case of State *ex rel.* Adams vs. Judge (*supra*), the Legislature in authorizing proceedings of this nature "proposed to supply another method, by civil proceedings," of disbarring attorneys. And to the method, by civil proceedings, thus applied, the rule of prescription, which relates to civil rather than that which relates to criminal actions, is to be applied.

The counsel for defendant claims that if this view be adopted, the action is nevertheless barred by the prescription of one year, as declared by C. C. 3536, against actions resulting from offenses. This is to assume that the cause of action arises *ex delicto* and an inquiry as to what it meant by that term is rendered necessary.

In Kohn vs. Carrollton R. R., 10 Ann. 719, Mr. Justice Spofford, as the organ of this court, citing the authorities of Marcade, distinguished between damages *ex delicto* and damages *ex contractu*, by saying that "the former flow from the violation of a general duty, the latter from the breach of a special obligation." Accepting this definition, the question is, has this action been brought to disbar the defendant because of an alleged violation of a general duty, or of an alleged breach of a special obligation?

The relator, after setting forth the various acts of misconduct with which the defendant is charged, proceeds as follows: "That he has been informed that all, or most, of the above criminal suits against the said Paul Louis Fourchy have been *nolle prossed,* but notwithstanding this fact, the said Fourchy has been guilty of professional misconduct in all of said cases and his actions have brought great scandal upon the profession of the law and the administration of justice in Louisiana, and that the said Paul Louis Fourchy should be deprived of the right to practice law hereafter in Louisiana. Wherefore relator prays * * * judgment decreeing the said Paul Louis Fourchy guilty of gross professional misconduct, and that he be punished by disbarment and withdrawal of his license to practice law," etc.

The reason, then, for the withdrawal of the license issued to the

defendant to practice law in the courts of this State, is stated to be that he "has been guilty of professional misconduct * * * and his actions have brought great scandal on the profession of the law and the administration of justice in Louisiana." But the obligation which rests upon an attorney, acting in that capacity, to conduct himself honestly and in such manner as to avoid bringing scandal upon the profession to which he has been admitted, and upon the courts of which he is an officer, is not the general duty which the ordinary layman owes to the public at large, but a special obligation which the attorney has voluntarily imposed upon himself, by his oath and by the acceptance of his license, in favor of his profession, and of the courts as administrators of justice. And the action to disbar him is predicated upon the breach of that obligation, and has for its purpose, not the punishment of the defendant, as suggested by the prayer of the petition, but the purging of the courts of an officer, who obtained his appointment upon the faith of his supposed good character and of his assurance that it would be kept good, but who is charged with conduct which, under the law, constitutes a breach of the special obligation thus assumed by him. We have already seen from the language used by the Supreme Court of the United States in *Ex parte* Garland (*supra*) that attorneys are officers of the court, admitted upon evidence of their possessing sufficient legal learning "and fair private character," and that, from the entry of the judgment making them officers of the court, they "are responsible to it for professional misconduct." In a later case, the same tribunal said, in considering the relations existing between an attorney and the courts in which he was admitted to practice, and with reference to a judgment of disbarment before it on appeal: " The provisions of the Constitution which declare that no person shall be held to answer for a capital, or otherwise infamous, crime, unless on a presentment or indictment of the Grand Jury; and that the trial of all crimes, except in the cases of impeachment, shall be by jury, have no relation to the subject in hand, * * * the constitutional privilege of trial by jury for crimes does not apply to prevent the courts from punishing its officers for contempt or from removing them in proper cases. Removal from office for an indictable offense is no bar to indictment. The proceeding is in its nature civil, and collateral to any criminal prosecution by indictment. The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice

from the administration of persons unfit to practice in them." And the court goes on to say that whilst the power to disbar should be exercised with great caution, yet that in a proper case "the courts ought not to hesitate to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws."

*Ex parte* Wall., 107 U. S. 265.

It follows from this that the prescription invoked is inapplicable, since this action does not arise from an offense or *quasi*-offense, save in the sense that, by the commission of the offenses with which he is charged, the defendant, if the charges be sustained, has violated a special obligation, contractual in its nature, in consideration of which he was granted the license with which it is now proposed, by reason of such violation, to withdraw. The obligation which the defendant has violated, if the charge against him be true, is that, whereby he undertook to conduct himself honestly as an attorney and to maintain the good character upon the faith of which he was admitted to the bar, and the only prescription applicable to the action growing out of such violation seems to be that of ten years.

For these reasons, it is ordered, adjudged and decreed, that the exception of "no cause of action" be maintained in so far as it relates to charges of embezzlement of which the defendant is said to have been guilty in the year 1895, and that said charges be held to constitute no cause of action for the purpose of this suit. It is further ordered, adjudged and decreed, that, as to all other charges contained in the petition, said exception, and all other exceptions herein filed, including the plea of prescription, be, and the same are hereby overruled.

## ON THE MERITS.

MONROE, J. The judgment which has been rendered upon the exceptions herein filed leaves, for present consideration, two charges against the defendant, to-wit: (1) That, on the 31st day of July, 1896, said Paul Louis Fourchy, " in his capacity as attorney at law, and acting as the agent of Emile J. LeBlanc, received from him the sum of $1,687.75, which the said Fourchy converted to his own use and embezzled, refusing to pay back the same, although he was requested to do so, and was legally placed in default; that the said Fourchy was indicted by the Grand Jury of this State and brought

before the Criminal District Court of the Parish of Orleans, in suit No. 25,276 on the docket of the Criminal District Court, and that the said case was once brought to trial, and, upon the trial thereof, the said Fourchy was convicted of embezzlement, and a new trial was subsequently granted."

(2) "That on, or about, the ———— day of December, 1898, said Paul Louis Fourchy, as attorney for the successions of one Modtler and wife, under the pretense that he needed money to conduct a law suit, induced John L. Modtler to sign a paper purporting to be a mortgage of real estate, but which really was an act of sale, for the express consideration of $500.00; that the said John L. Modtler was unable to read or write, and the said Fourchy, being aware of that fact, deceived the said Modtler, inducing him, as aforesaid, under false pretenses, to sell his property instead of mortgaging the same. Relator further avers that the said J. L. Modtler instituted suit in the Civil District Court for the Parish of Orleans, No. 56,424 on the docket of said court, against Elias Levy and Paul L. Fourchy, to annul the said fraudulent sale, and, upon the trial thereof, the said sale was annulled as fraudulent."

I.

As to the first of these charges, it appears, from the evidence adduced upon the trial of the case upon the merits, that Act No. 129 of 1896, although approved July 9th, was not promulgated at the State capital, where the State journal is published, until July 25th, from which it follows, that it did not take effect in New Orleans until August 14th, 1896. Article 40 of the Constitution of 1879 provided (and Article 42 of the present Constitution provides), that "No law passed by the General Assembly, except the general appropriation act, or act appropriating money for the expenses of the General Assembly, shall take effect until promulgated. A law shall be considered promulgated at the place where the State journal is published the day after the publication of such law in the State journal and in all other parts of the State twenty days after such publication."

See also C. C. Arts. 4, 5 and 6.

But, it is claimed, on behalf of the State, that the defendant could have been disbarred for the particular offense now under consideration, as charged in the petition, under the law as it existed prior to the adoption of the Act of 1896, inasmuch as it is not only alleged that, in this instance, he received money in his capacity of attorney at law,

and failed to account for the same, but that he was thereafter convicted of embezzlement; and, hence, that the statute mentioned, as also the provisions of the present Constitution, operate merely to determine the forum and regulate the proceedings, and are not open to the objections which have been sustained to their application to acts said to have been committed by the defendant in 1895, and with respect to which no convictions were alleged.

There is, however, at this point, a question of fact involved, upon which depends the jurisdiction of this court. Whilst it is alleged that the defendant, "in his capacity as attorney at law, and acting as the agent of Emile J. LeBlanc, received from him the sum of $1,687.75 which the said Fourchy converted to his own use, embezzled," etc., the evidence, adduced upon the trial, shows, conclusively, that the transaction in question was one in which the defendant did not act, and did not pretend to act, in his professional capacity, as an attorney at law. In the indictment under which he was subsequently prosecuted, it was charged that he was acting as agent of Emile J. LeBlanc, and the effort in this court has been to establish that fact, as against the defendant's contention that he occupied merely the position of a borrower. Under these circumstances, it seems clear that the "exclusive original jurisdiction," conferred upon this court by the Constitution, "in all matters touching professional misconduct of members of the bar," does not attach. It will be observed that when this constitutional provision was adopted the Act of 1896 was in force; and that, by the terms of that act, jurisdiction is conferred upon the District Courts to disbar any attorney at law who "shall be convicted of any felony, *or* shall be guilty of a gross professional misconduct" (italics by the court.) The Convention which adopted the Constitution might have used the same terms in conferring jurisdiction upon this court, but it did not. And, from the language used, no other conclusion can fairly be drawn than that it was the deliberate purpose of that Convention to limit the exceptional "exclusive and original" jurisdiction so conferred, to cases of professional misconduct, whilst leaving non-professional misconduct to be dealt with, in the first instance, by the courts of ordinary and general jurisdiction, as provided by the existing laws.

There is here presented, therefore, no question of the inherent jurisdiction of a court to purge itself of an unworthy officer, or of a conflict, arising therefrom, between legislative and judicial authority,

since the jurisdiction specifically invoked by the State, and the only jurisdiction invoked for the purposes of this case, is that which has been conferred upon this court, in plain language, by the Constitution which established the court itself, which jurisdiction, according to the terms of the grant, does not extend to the matter now under consideration.

## II.

The remaining charge is predicated upon the following facts, as we find them established by the evidence in the record:

In July, 1897, A. J. Lafrance, who had been a client of the defendant's, brought to the office of the latter one John L. Modtler, who employed the defendant to put him in possession of an estate, consisting of movable property, of inconsiderable value, and a small house and two vacant lots, on Roman street in New Orleans, worth, together, about $500.00, which had been left by his deceased parents. The parties informed the defendant that Modtler was the sole heir of the decedents, and, upon the basis of that information, the defendant prepared a petition setting forth that fact, which petition was signed by Modtler and sworn to by Lafrance and another witness produced by Modtler; and, upon July 7, 1897, judgment was obtained putting the latter in possession in accordance with the prayer thereof. For this service the defendant received $25, out of which certain costs were paid, so that the net amount of his fee was about $20. Three months later, to-wit; upon October 5, 1897, a petition was filed, in the succession thus, apparently, closed, in the name of Mrs. Catherine Fauss, who claimed to be the widow in community of Modtler's deceased father and natural tutrix of a minor daughter, then about sixteen years old, issue of the marriage, in which petition, after reciting the proceedings whereby Modtler had been put in possession as sole heir of his father's estate, it was alleged that the same were based on fraud and perjury, and should be annulled and the rights of the minor recognized. The citation, together with a copy of the petition in the suit thus filed, were served on Modtler, personally, and were, by him, turned over to the defendant, who, upon November 2nd, 1897, filed certain exceptions, as the result of which the suit was discontinued, December 7th, 1897. Upon the following day, the action was renewed, in the form of a rule to show cause, which was also served upon Modtler, personally, and, by him, turned over to the defendant, who again excepted, and the rule was dismissed, as in case of non-suit, by

judgment signed January 12th, 1898. The counsel who represented the alleged widow and tutrix thereupon informed the defendant that he would have his client properly qualified and would, again, bring the action, in proper form. And the defendant, it appears, then informed Modtler that he would do nothing more for the fee which he had received, and demanded $50 for the further service which, it was anticipated, he would, at once, be called on to render. Modtler, not being possessed of that amount, stated, at first, that he would get it, but, later, informed the defendant that he was unable to do so; and the defendant, then, suggested that one Elias Levy, a client of his, would furnish it, if properly secured. The evidence shows that, by reason of the probability that, in the event of a resort to the courts, the proceeds will be consumed in the payment of privileged claims, it is impossible, in the ordinary course of business, to borrow money upon the mortgage of property of such small value as that in question and that it is quite a common thing to arrange for a loan in such a case by a sale and resale of the property, the lender being the last seller, and retaining the vendor's privilege for the amount of his loan, which figures as the unpaid portion of the price for which he sells the property. In other cases, the parties may of course resort to a *vente a remere;* and, in still other cases, the transaction takes the form of a *vente a remere,* unaccompanied by delivery, and is thus held to be, merely, a pignorative contract, for which the thing, nominally sold, stands as security (Maxwell vs. Roach, 106 La. 123.) In the instant case, the instrument first drawn to secure the lender, reads as follows, to-wit:

"Be it known that on this 21st day of January, 1898, I, John L. Modtler, does (?) sell, transfer, and assign unto Elias Levy, with full warranty, the property inherited by me from my father, and situated on Roman street, between Marigny and Mandeville, and Prieur street in the rear, for and in consideration of the price and sum of five hundred dollars, cash, the receipt whereof is hereby acknowledged. New Orleans, January 21, 1898." (Signed) John L. Modtler.

This instrument was delivered to Levy without registration, and with the understanding that it was to operate as security for the fifty dollars which he had advanced, the idea that Modtler should, at that time, surrender possession not being suggested, and the time within which the money should be returned being variously stated by

the witnesses at forty, or sixty, days; sixty, or ninety, days; and three months, or a year. A few days later Levy concluded that the instrument thus executed was not sufficiently formal, and, upon January 28th, 1898, the defendant, in his capacity as notary public, drew up an instrument to the same effect but in the form of a notarial act, which was signed by both Modtler and Levy, as also by the notary and two witnesses. All certificates were, however, waived, except the conveyance certificate, and even that appears not to have been produced; the instrument was not registered, and the vendor still remained in possession of the property. Upon March 3rd, Mrs. Widow Modtler, who had in the meanwhile qualified as tutrix, again filed suit on behalf of John L. Modtler's minor half-sister, attacking the judgment whereby he had been put in possession of the property thus affected, and, upon March 17th, Elias Levy caused a copy of the act above referred to, to be recorded in the Conveyance Office, and, perhaps, a week later, demanded to be recognized as the owner of the property. It does not appear that this action was taken at the suggestion, or with the knowledge, of the defendant, and, when Modtler, who claims that he had merely mortgaged, and had not sold his property, called, with his friend Lafrance, upon the defendant, for an explanation of Levy's claim of ownership, the defendant, as Modtler testifies, told him "that it would be all right, that it was just a mortgage, and it would be all right." The defendant was, however, at that time in great trouble, and does not appear to have given, and was, probably, unable to give, the attention to Modtler's affairs that he would otherwise have given. Modtler, therefore, consulted other counsel, to whom he, also, entrusted the further defense of the pending suit on behalf of his minor sister, in which the defendant had filed exceptions. The counsel thus employed brought suit, in April, 1898, against the defendant and Elias Levy, to annul the putative sale to the latter, on the ground that Modtler's signature thereto had been obtained by fraud, and that he believed himself to be executing merely an act of mortgage, to which suit the parties defendant answered, and there was, eventually, in February, 1899, judgment annulling said transaction, as a sale, and holding the same to be a mortgage in favor of Levy, and upon Modtler's interest in the property, for the sum of $50, with legal interest. The counsel so employed also looked into the matter of the claim set up on behalf of the alleged minor sister, and reached the conclusion that the tutrix had been married to Modtler's father, and

that the minor was the issue of that marriage, and was entitled to one-fourth of her father's estate, and there was judgment accordingly, May 5, 1898, which was followed by a sale, to effect a partition, with the result that the proceeds were exhausted by preference claims, and Elias Levy recovered no part of his $50.

Modtler's position was, and is, that he was given to understand that the instrument dated January 28th, 1898, the signature to which he admits, was merely an act of mortgage, to secure the sum of $50, and not an act of sale for $500, as it purports to be. He denies, under oath, that he ever saw or signed the instrument of January 21st, 1898, and he, also, denies, under oath, that the act of January 28th, 1898, was read to him.

The position of the defendant was, and is, that the transaction between Modtler and Levy, as represented by the instruments of January 21st, and January 28th, 1898, respectively, was intended to secure the loan made by Levy, subject to a verbal understanding that it should operate as a sale only in case the loan was not paid at maturity, and he and Levy, and Levy's brother, Moses Levy, swear that the matter was so explained to Modtler, and that the instrument dated January 21st was read to, and signed by him; and the defendant and Elias Levy testify to the same effect as to the act dated January 28th, 1898.

It will thus be seen that, for the purpose of determining whether the defendant intended to perpetrate a fraud upon Modtler, a good deal depends upon the latter's credibility as a witness. We must, also, consider the probabilities of the case as affected by surrounding circumstances. Modtler is shown not only to be an extremely ignorant man, who is unable to read, and can write nothing but his signature, but he also appears to be far below the average of even ignorant men in natural intelligence. He lived, up to the time of the sale, in the back part of the little one-story house which he had inherited, and he rented the front to his friend, Lafrance, who could read and write, and who was in the habit of reading to him such papers as concerned his interests and of advising him as to his business.

Modtler swears that at the time that he informed the defendant that he was the sole heir of his father he did not know and had never heard, from anybody, that he had a sister living; and that he never heard of the existence of such a sister until the property was sold to effect the partition between them. This statement he immediately

contradicts, however, by saying that he heard of the existence of his sister from the counsel employed by him (in March, 1898) to replace the defendant, but had never heard of it before. Nevertheless, it appears that the girl had lived within a few squares of him, all of her life; that his father had lived with her mother; and that Lafrance, who lived in the same house, and occupied the intimate relation towards him which has been described, had heard that she was the elder Modtler's daughter, but had doubts as to whether the parents were married, because he had never heard that Modtler, Sr., had been divorced from a wife living in the Parish of St. James. But, beyond this, in October, 1897, a copy of the petition in which the girl's existence and filiation were set forth, was served on Modtler, personally, and, in December, a copy of the rule taken on her behalf was similarly served; and these papers were handed over by Modtler to the defendant, and both proceedings were dismissed, upon dilatory exceptions filed by the latter; and yet, we are told by the witness that he was not informed, then, or until some months later, when the defendant had ceased to represent him, that he had a sister, or that any living person claimed to be his father's daughter. No reason is suggested why the defendant should have concealed from his client the nature of the suit which he was employed to defend, and should have appeared in the matter in absolute, and unnecessary, ignorance of the facts and of his client's views. And he testifies that he did not so act. Nor is it explained why Lafrance, who had sworn that Modtler was his father's sole heir, and who was in the habit of aiding Modtler by reading to him such papers as he received, failed to read the particular, and very exceptional, documents in question, and to enlighten his friend as to their contents.

After the two first attacks made on behalf of the minor sister had been successfully parried, and the defendant called for fifty dollars for services to be rendered in meeting the third attack, one would suppose that some suspicion, at least, of the nature of the trouble might have penetrated the mind of the witness, as the person most concerned. But he swears that such was not the case; that the defendant merely told him that the $50 was needed to clear the property of some trouble, and did not tell him, and that he did not know, what that trouble was about, or that any one pretending to be his sister was making any claim against him, or against the estate of which he had been put in possession.

Modtler swears that the petition signed by him, and sworn to by Lafrance, and by another witness produced by Modtler, was not read to him. Lafrance, though at first denying, finally admits that the petition and the affidavit were read to him and to the other witness, but is unable to remember whether Modtler was present. The defendant testifies that upon hearing Modtler's statement of his case, he told him that he would need two witnesses, and that Modtler brought them to his office, and that the petition and affidavit were read in the presence of all three of them, and that Modtler signed the petition and the witnesses signed the affidavit. It seems to us improbable that the witnesses should have gone to the defendant's office, otherwise than at the instance of the party interested, and quite probable, upon the other hand, that if Lafrance had taxed his memory a little, he would have been able to testify that the petition was read in the presence of Modtler as well as in that of his fellow witness and himself. Modtler swears that the document dated January 21st, 1898, was never read to, or signed by, him. Three witnesses, the defendant and the two brothers Levy, testify to the contrary. The signature, when compared with those which are admitted, appears to us to be genuine. We find no sufficient reason or motive for a forgery, and we conclude that the signature in question is what it purports to be.

Modtler denies that the act dated January 28th, 1898, was read to him, as written, but that, as read, it purported to be an act of mortgage. The defendant and Elias Levy testify that the act was read, as written. Considering the general character of the testimony given by the witness Modtler, and his lack of intelligence, from which we conclude that he would be incompetent, probably, to recognize an act of mortgage from hearing it read, we conclude that his statement, last above referred to, cannot be held to overbear that of the other two witnesses, and that it should be taken as a fact that the act in question was read to him, as written.

Upon the facts as thus found there is no doubt that the professional conduct of the defendant is open to criticism. We believe it to be true that the instruments prepared for Modtler's signature, and signed by him, were read to him before they were signed, but it is also true, as we think, that he was given to understand that they would operate merely as a mortgage, and would only take effect as a sale in the event of his failure to repay, at maturity, the loan made to him. And, with his limited intelligence, it is quite likely that he failed to

appreciate the fact that, in the contingency mentioned, he stood, upon the face of the papers, to be entirely deprived of his property for an inadequate consideration.    Moreover, the time within which the loan was to have been repaid seems to have been uncertain, even as a matter of verbal agreement; and, finally, his rights in the premises were made dependent upon a verbal agreement, whilst those of the other contracting party were expressed in a written instrument, at variance with such agreement.    All this is worthy of severe censure.

Upon the other hand, the small value of the property, and the threatened litigation concerning it, rendered it reasonably certain that no loan could have been negotiated upon an ordinary mortgage. And, whilst the course pursued was open to the objections which have been stated, and, perhaps, to others, the character of the instrument first executed to secure the money obtained, and the fact that the other was not registered for nearly seven weeks after its execution, during which time there was no change of possession and no claim of ownership by the nominal vendee, and the further fact that the act in question was eventually registered, not by the defendant, either as notary, or otherwise, or by means of the original instrument in his possession, but at the instance of the apparent vendee, and by means of a copy, are all circumstances, which, taken in connection with the direct testimony in the case, carry conviction to the mind that the defendant had no intention of perpetrating fraud, and did not contemplate that the ignorant man who was acting under his advice should be bound otherwise than as he consented to bind himself.

In conclusion, we think it proper to say that this case has been presented with exceptional earnestness and ability, our appreciation of which is enhanced by knowledge of the fact that the counsel who have appeared have been moved by no other considerations than a high sense of professional obligation and public duty, upon the one side, and of generous sympathy for a distressed member of the profession, upon the other.

For these reasons, it is ordered, adjudged, and decreed that, as to the first charge considered in the foregoing opinion, this action be dismissed for want of jurisdiction in the court; and, as to the second, and remaining, charge, there be judgment in favor of the defendant, rejecting plaintiff's demand.

## DISSENTING OPINION.

BLANCHARD, J. I am of the opinion that because a member of the bar, who receives money from a client for investment, adds to his signature to the receipt given for the money the words "Not. Pub.," or "Notary Public" (he holding a commission as notary and pursuing that vocation as an addition or incident to his profession) he is not relieved thereby from the charge of *gross professional misconduct* if he embezzles the funds.

Had he merely signed his name to the receipt without any addition, whether as attorney or notary, and had he embezzled the money, 'he would certainly be amenable to the charge of gross professional misconduct.

The addition of the words "Notary Public" do not, in my view, render what he did any the less professional misconduct.

He was agent of the client whether he received the money as a lawyer or notary. The character of this agency, whether as lawyer or notary, was centered on one and the same person.

It is the violation of *the trust* of this agency that constitutes the gross professional misconduct which renders him liable to disbarment from practice before the courts *as a lawyer*.

The distinction made in the opinion of the court between "lawyer" and "notary" is, I think, too refined.

I respectfully dissent.