**COURT OF APPEALS,**

March 14, 1911.

# THE PEOPLE v. CHARLES L. GREEN.

201 N. Y. 172.)

1. MURDER—VERDICT SUSTAINED.

The defendant appeals from a judgment of the County Court of Albany county upon a conviction of murder in the first degree and from an order denying a new trial. *Held*, that the case was one for the jury; that the defendant had a fair trial before a tribunal having jurisdiction to try the accusation against him, and was convicted upon legal evidence amply sufficient to sustain the verdict.

2. SAME—JURISDICTION—COUNTY COURT—ALBANY COUNTY—LEGISLATURE HAS POWER TO CONFER JURISDICTION TO TRY PAST OFFENSES.

Before the commission of the homicide the legislature conferred jurisdiction on the County Court of Albany County to try and determine indictments for crimes punishable with death. The act took effect after the date on which the murder was committed. (L. 1910, ch. 588.) *Held*, that the legislature has power to confer jurisdiction to try past offenses upon an existing court and that the County Court of Albany county had jurisdiction to try the appellant for the crime of which he was convicted.

3. SAME—TRANSFER OF CASE FROM SUPREME COURT.

The defendant was not deprived of any right to move to change the venue by reason of the transfer of the indictment for trial from the Supreme to the County Court. (Code Crim. Proc. § 346.)

The admission of evidence which did not relate to any direct issue in the case and which only tended to establish what was otherwise established by uncontradicted evidence, held to be harmless and not ground for reversal.

APPEAL from a judgment of the Albany County Court rendered November 5, 1910, upon a verdict convicting the

defendant of the crime of murder in the first degree; also from an order denying a motion for a new trial.

The facts, so far as material, are stated in the opinion.

*John H. Dugan* for appellant. The Albany County Court did not have jurisdiction to try the defendant for the crime of murder in the first degree. (*N. Y. & O. M. R. R. Co.* v. *Van Horn,* 57 N. Y. 473; *Bootjer* v. *Supreme Council,* 78 App. Div. 546; *Amsbry* v. *Hinds,* 48 N. Y. 57; *Isola* v. *Weber,* 147 N. Y. 329; *U. S. Fidelity Co.* v. *Struthers, Wells Co.,* 209 U. S. 314; *U. S.* v. *American Sugar Co.,* 202 U. S. 577; *People ex rel. Newcomb* v. *McCall,* 94 N. Y. 587; *Kring* v. *Missouri,* 107 U. S. 221; *Blair* v. *Chicago,* 201 U. S. 400; *United States* v. *Crosley,* 196 U. S. 327.) The defendant was deprived of his absolute right to make a motion to change the place of trial. (*People* v. *McLaughlin,* 150 N. Y. 375; *Edwards* v. *Shreve,* 83 App. Div. 165; *Kring* v. *Missouri,* 107 U. S. 223.) It was error to receive in evidence the box which was found in the house where the defendant was arrested, on which was written " good-by all," because there was no evidence that the defendant wrote it, or was in any way connected with it. (*People* v. *Corey,* 148 N. Y. 480.)

*Rollin B. Sanford, District Attorney (Harold B. Alexander* of counsel), for respondent. The statute conferring jurisdiction upon the Albany County Court applied to all causes which occurred before the act went into effect. (*Matter of Davis,* 149 N. Y. 539; *Lazarus* v. *Metropolitan Co.,* 145 N. Y. 581; *Southwick* v. *Southwick,* 49 N. Y. 510, 517; *People* v. *Syracuse,* 128 App. Div. 702; 2 Sutherland on Stat. Const. 1226; *People ex rel. Collins* v. *Spencer,* 99 N. Y. 225; *Myers* v. *Moran,* 113 App. Div. 427; *Laird* v. *Carton,* 196 N. Y. 169; *Thompson* v. *Missouri,* 171 U. S. 380; *Peo-*

*ple* v. *Beckwith,* 108 N. Y. 67; *People ex rel. Lewisohn* v. *Court of General Sessions,* 96 App. Div. 201; 179 N. Y. 594; *People ex rel. Spain* v. *Coyle,* 55 App. Div. 223.) The only mode of changing venue in criminal cases is by direct application to the Supreme Court without any preliminary steps. (Code Crim. Pro. § 343; *People* v. *McGlaughlin,* 2 App. Div. 408, 411; 150 N. Y. 365; *People* v. *Beckwith,* 108 N. Y. 67; *People* v. *Jackson,* 114 App. Div. 697; *Matter of Montgomery,* 136 App. Div. 72.)

WILLARD BARTLETT, J. The defendant appeals from a judgment of the County Court of Albany county upon a conviction of murder in the first degree, and also from an order denying a motion for a new trial. His notice of appeal assumes also to bring before us several other orders of an interlocutory character; but as these do not constitute a part of the judgment roll as prescribed by section 485 of the Code of Criminal Procedure they do not appear to be reviewable under section 517 which provides what intermediate orders or proceedings may be reviewed. However, we have considered every point argued before us in behalf of the appellant, irrespective of any technical objection which may exist as to the manner in which it is brought up.

The defendant shot and killed his daughter, Eva Green, a girl about fourteen years of age, in the township of New Scotland, in Albany county, on the 27th day of July, 1910. The homicide was committed with a rifle, on premises known as the Van Dyke farm, at about three o'clock in the afternoon, in the presence of the mother of the victim—who was also shot by the defendant, but not fatally; a little brother five or six years old; two uncles of Mrs. Green, who were working on the farm at the time; and a lad of thirteen, who was the son of one of these uncles. The defendant was indicted for murder in the first degree on October 7, 1910,

and then pleaded not guilty. Subsequently he added to this plea a specification that he was insane at the time when the offense was committed.

Immediately after the plea of not guilty was interposed the district attorney, upon notice to counsel for the defendant, applied to the Supreme Court at Trial Term for an order removing the indictment to the County Court of Albany county, which order was granted over the objection of the defendant's counsel that the statute conferring jurisdiction to try capital cases upon the County Court was an *ex post facto* law as applied to this homicide, because the homicide was committed on July 27, 1910, and the statute did not go into effect until the 1st of September in that year. On October 17, 1910, the defendant moved in the County Court for an order sending the indictment back to the Supreme Court to enable him to move at a Special Term thereof to change the place of trial on the ground that a fair and impartial trial could not be had in Albany county. This motion was denied as was also another motion, three days later, to retransfer the case to the Supreme Court on account of the objection to the jurisdiction of the County Court already mentioned. The indictment was then brought to trial in the County Court of Albany county at a term beginning on November 1, 1910, and resulted in the conviction of the defendant of the crime of murder in the first degree.

As happens in almost all cases of this character it is argued that the evidence did not warrant the jury in finding the existence of the premeditation and deliberation necessary to constitute the highest degree of felonious homicide. This contention compels us invariably to consider the facts with the utmost care. It will suffice, however, to make as concise a statement as possible of the circumstances of the tragedy.

The defendant, a man about forty years of age, lived with his family on a small farm in the southern part of Albany

county, where he appears to have been occupied partly in farming and to a considerable extent in hunting. One of the witnesses described him as "a man of the woods." His family consisted of his wife, Emma Green; his daughter, Eva Green, (the girl whom he killed), and the little boy who has been mentioned. There had been marital differences in the household for some time, the character of which the wife refused to disclose when testifying as a witness in her husband's behalf, saying, "I don't want to tell anything that would hurt my husband"—and this notwithstanding that he had shot her first, inflicting a terrible wound in the head, at the time he killed the daughter. The fact that the daughter was an element in the controversy between the husband and wife is indicated by his statement to one of Mrs. Green's uncles, not long before the shooting, to the effect that "the girl had always made trouble ever since she had been with them," apparently referring to what had occurred since her return from a sojourn in some other family.

On the morning of the homicide the differences between Green and Mrs. Green had evidently grown so intense that the wife feared harm at his hands. He was going to cut wood, and asked her to go with him and take the horse and cow to pasture. She went half way, when something in his demeanor or conversation, or both, caused her to turn back abruptly and leave him. "I don't think we were quite half way to the pasture," she says, "when he stopped and asked me what I had been talking about down to his sister's. I didn't say anything. I turned around and went back home." She then took her children and went to the house of a neighbor named Levi Nickerson. Subsequently she visited another neighbor by the name of L'Amoureux, but we know little about her movements until afternoon except that she and her children remained away from home. At about 3 o'clock P. M. they came to a wagon house on the Van Dyke farm where

Mrs. Green's uncle, William J. Vadney was at work. After about fifteen minutes' conversation with this uncle, she screamed, " There comes Charlie! " and the defendant was seen approaching on the road. At this time he had nothing in his hands and was apparently unarmed. He made no reply to his wife's scream but, as the uncle testifies, walked directly toward his wife and children while they were screaming. Mr. William J. Vadney stepped between them and asked what the trouble was. The defendant answered, " I will tell you," and suggested that they go out of the wagon house, but leave the children there. Mrs. Green hesitated, but her uncle told her to come along. They sat down behind an old railing near the dwelling house and Green said to Mr. Vadney that his wife had been leaving home and had been with other men. Mrs. Green denied the charge. Green asked Mr. Vadney, " What would you do? " Mr. Vadney responded that he knew nothing about their troubles and would advise them to return home, as he could see no reason why they could not get along, but if they could not get along together he would advise them to separate. Mrs. Green then said she could take care of herself, but wanted the boy. " Green said he wanted the boy, and the boy at that moment screamed and grabbed hold of his mother." Thereupon they returned to the wagon house where Green asked his wife if she intended to go back with him. " She said she was afraid and her daughter Eva would not go at that time." The defendant then asked Mrs. Green why she went over to L'Amoureux's that morning. The uncle here testifies: " She told me she was afraid of him; that he had asked her to accompany him over in the woods several days before that and she refused to go. That was her reason for leaving home. Green stood there for a while and he said the girl had always made trouble ever since she had been with them." Eva said, " I don't know how I could have made any trouble."

There was some further conversation in which the defendant said the only thing he had ever done was to hit Eva with a whip and the whip struck his wife. Finally Green said to his wife, " Do you intend to go home with me? This is the last time I ask you." He went out of the door of the wagon house and Mrs. Green and the children left at about the same time to go up into the pasture where Mrs. Green's other uncle, Mr. Howard W. Vadney, was at work.

They had been with Mr. Howard W. Vadney only two or three minutes when the defendant reappeared on the scene carrying a rifle. As he approached the group within thirty or forty feet Mrs. Green exclaimed, " There comes—there is Charlie; he is going to shoot me." Her uncle Howard endeavored to allay her fears and told Green he wanted to talk to him. Green said he had talked all he was going to, and told his wife to go home. " I want you to go home; go on," he exclaimed to his wife and children, at the same time pointing·his rifle around over their heads. They screamed and started toward the wagon house, Mrs. Green calling out the name of her uncle William as they approached the building. Mr. William J. Vadney heard her voice, came out of the wagon house, exclaimed to Green, " Wait a minute! " when the defendant raised his rifle and shot first his wife and then his daughter. Only the second shot proved fatal.

After the shooting the defendant manifested some symptoms of contrition. He partly lifted his wounded wife and said, " Why did I do it? " or " What made me do it? " also, " Why did you let me do it; why didn't you stop me? " When asked, however, to harness the horse and get a doctor, he said he couldn't do that; " The girl is dead and Emma is alive; do what you can for her." Then he turned around and walked away.

On the following day when under arrest Green was found to be suffering from a gunshot wound in the head which he said he

had inflicted upon himself with a revolver. He told a deputy sheriff that he had done the shooting on the day before with a thirty-thirty Savage rifle, which was in the woodshed near the Vanderbilt residence half a mile from his farm. He also said that he had shot himself with a Colt's revolver which would be found near a swamp in the vicinity. The rifle and a pasteboard box of thirty-thirty cartridges were found in the place indicated by the defendant. Upon the box the words " Goodbye all " appeared in handwriting but in whose handwriting was not shown.

The facts thus far narrated were proved upon the trial without dispute. The killing of Eva Green by the defendant was established beyond all doubt whatever and the deliberate and premeditated design to kill beyond any reasonable doubt, provided the defendant knew the nature and quality of his act or that it was wrong. This brings us to the specification of insanity in his plea of not guilty. The evidence in support of this defense was for the most part exceedingly vague and weak. Mrs. Green, it is true, gave testimony to the effect that her husband's demeanor and appearance had been different from usual for a month or so previous to the homicide. She says he didn't act as though he felt very good. " He didn't look good out of his eyes. They looked glassy and wild. He did not sleep very good nights. He would get up and walk around and then lay down." She also described his appearance as " crazy " at the interview at the wagon house before he went away and returned with his rifle. There is nothing in Mrs. Green's evidence, however, to warrant an inference that her husband's mental condition was such as to relieve him from the consequences of an act otherwise criminal. The testimony of the other witnesses called on this branch of the case is weaker still. It proves nothing more than erratic or eccentric conduct on a few. specified occasions. In rebuttal, the prosecution called two expert alien-

ists of long experience in the treatment of the insane who had carefully examined the defendant and expressed the opinion that he was sane.

This review of the fact suffices to show that the case was one for the jury and that we should not be justified in interfering with their conclusion unless some error of law was committed which was prejudicial to the defendant. We will now consider the contentions in his behalf to this effect.

The law points in behalf of the appellant are three in number:

I. That the Albany County Court did not have jurisdiction to try the defendant for the crime of murder in the first degree.

II. That the defendant was deprived of his absolute right to make a motion to change the place of trial.

III. That it was error to receive in evidence the box which was found in the house where the defendant was arrested on which was written " Good-bye all," because there was no evidence that the defendant wrote it or was in any way connected with it.

(1) As to the objection to the jurisdiction of the court:

The homicide for which the defendant was indicted was committed on the 27th day of July, 1910. By chapter 588 of the Laws of 1910, passed June 21, 1910, section 39 of the Code of Criminal Procedure had been amended so as to give the County Court of Albany county jurisdiction to try and determine indictments for crimes punishable with death. This amendatory statute, however, did not take effect until September 1, 1910. As has been said, the defendant was tried in the County Court of Albany for murder in the first degree and convicted of that crime at a term beginning on the 1st day of November, 1910. It is contended that the County Court was without jurisdiction to try this indictment because the offense thereby charged was committed before the statute took effect which for the first time empowered the County

Court to try capital cases. The learned counsel for the defendant insists that to hold otherwise is to make the amendatory statute an *ex post facto* law, forbidden by the Constitution of the United States.

When the defendant shot and killed his daughter the law was that capital cases were not then triable by the County Court of Albany county, but would be triable by that court after September 1, 1910. The amendment to the Code of Criminal Procedure by which this change was brought about in nowise affected the rights of persons accused of murder in the first degree so far as any rules of evidence were concerned or relative to the nature or degree of the punishment prescribed. It did not assume to make any previously innocent action criminal or punishable, or to make a crime graver than it was when committed. It did not alter the situation of the defendant to his disadvantage in relation to his offense or its consequences simply because it made that offense triable in a County Court as well as in the Supreme Court. Hence it was lacking in the essential elements of an *ex post facto* law, according to the meaning of that term as established by numerous judicial decisions of the highest authority. (See *Kring* v. *Missouri,* 107 U. S. 221, and cases there cited.)

" So far as mere modes of procedure are concerned," says Mr. Justice Cooley in his classic treatise on Constitutional Limitations, " a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, *and heard only by the courts, in existence when its facts arose.* The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though

it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime." (Cooley's Const. Lim. [7th ed.] p. 381; quoted approvingly in *Thompson* v. *Utah*, 170 U. S. 343, 351 and in *Thompson* v. *Missouri*, 171 U. S. 380.)

In the present case, to try the defendant in the County Court of Albany county instead of at a Trial Term of the Supreme Court did not deprive him of any protection which he would have enjoyed in the latter tribunal. For many years capital cases have been triable in the County Court of Kings county. We have not been referred to any case in which a statutory enlargement of the jurisdiction of a court has been deemed an *ex post facto* law. The position of counsel for the appellant is that one can be tried for a crime only in a tribunal which had jurisdiction over the offense at the time when the act alleged to be criminal was committed. If this were correct the Constitution of 1894 would have operated to prevent the trial of any capital cases which arose before its adoption (except in New York and Kings counties), for that Constitution abolished the Court of Oyer and Terminer, which alone previously had jurisdiction generally throughout the state to try indictments for murder in the first degree.

The power of the legislature to confer jurisdiction to try past offenses upon an existing court has been expressly asserted in Massachusetts by so eminent a judge as Chief Justice SHAW, who says: " A new tribunal may be erected, or new jurisdiction given to an existing court, to try past offenses, and this is not *ex post facto.*" (*Com.* v. *Phillips,* 11 Pick. 28, 32.) To the same effect is the case of *State* v. *Cooler* (30 S. C. 105, 110), where this language of the great chief justice is quoted with approval; and in Vermont it has been held that the legislature may confer upon justices of the peace jurisdiction of an offense committed before the passage of the act. (*State*

v. *Welch,* 65 Vt. 50.) Upon reason and authority we are satisfied that the County Court of Albany county possessed jurisdiction to try the appellant for the crime of which he has been convicted.

(2) As to the alleged deprivation of the right to move to change the venue on the ground of prejudice:

This point is based on a misapprehension of the meaning and effect of the provisions of the Code of Criminal Procedure relative to the removal of indictments before trial (sections 344, 346.) This indictment having been transferred to the County Court of Albany county, if the defendant wanted it sent to a term of the Supreme Court held in another county on the ground that a fair and impartial trial could not be had in the county where the indictment was pending (§ 344, subd. 2), he had only to apply to the Supreme Court at a Special Term in the district, upon notice to the district attorney, for an order of removal. (§ 344.) It was not necessary before making such application that the indictment should be sent back to the Supreme Court in Albany county. A motion to change the venue of a County Court indictment must be made to the Supreme Court under section 346 of the Code of Criminal Procedure, but that section does not require that the indictment shall first be transferred to the Supreme Court in the county where it was found. There was nothing to prevent the learned counsel for the defendant from applying to the Supreme Court under section 346 for an order of removal on the ground mentioned in subdivision 2 of section 344, if he had been so advised; and his client was deprived of no right in this respect.

(3) As to the alleged error in receiving in evidence the cartridge box with the words " Good-bye all " written thereon:

There is some difference of opinion among the members of the court as to whether or not this was technically an error; but all agree that it was absolutely harmless. At most, the

proof was designed to show an attempt at suicide by the defendant subsequent to the homicide; but such attempt was otherwise proved by the statement of the defendant to the deputy sheriff that he had shot himself with a revolver in a swamp in the rear of the Vanderbilt residence. The evidence did not relate to any direct issue in the case, and could not have been hurtful to the defendant, even if the jury assumed, what was not proved, that the words on the box had been written by him; for this only tended to establish what was otherwise established by uncontradicted testimony, namely, an attempted suicide.

No other exceptions are mentioned in the brief for the appellant; nor were any others called to our attention upon the oral argument. Nevertheless we have examined every one which the record contains and find none which presents reversible error. In some instances, if the objection of counsel had been more specific than it was the ruling of the trial judge might have been different, but it is clear that the numerous general objections were properly overruled; and such must be the view of counsel, or the exceptions would have been argued before us. The defendant has had a fair trial before a tribunal having jurisdiction to try the accusation against him, and has been convicted upon legal evidence amply sufficient to sustain the verdict. It follows that the judgment upon that conviction should be affirmed.

CULLEN, Ch. J., GRAY, WERNER, HISCOCK, CHASE and COLLIN, JJ., concur.

Judgment of conviction affirmed.