Dear Mr. Austin:
You requested the opinion of this office concerning a number of questions which have arisen in connection with the passage of Acts 374 and 1126 of the 1995 Legislative Session, which amended the provisions of LSA-R.S. 33:2955 pertaining to local government investments.
Act 374 enacts LSA-R.S. 33:2955(D) by requiring all political subdivisions to develop and adopt an investment policy, which should (i) reflect the mandate to manage public funds prudently; (ii) place appropriate emphasis on the goals of safety of principal first, liquidity second and yield third; (iii) establish internal controls for any derivatives in use to ensure that the risks inherent in derivatives are adequately managed.
Act 1126 amends LSA-R.S. 33:2955(A) to list the types of securities which are permissible investments and to list three types of obligations which are specifically prohibited from investment. It also enacts paragraph (D) which provides that, after August 15, 1995, the investment of monies in violation of the Section constitutes an intentional performance of a duty in an unlawful manner which may be prosecuted as malfeasance in office.
1. Does Section R.S. 33:2955A(1)(b)(iii) allow local governments to invest in STRIPS or zero coupon securities issued directly by the United States Treasury?
Section 2955(A)(1)(b)(iii) provides in pertinent part as follows:
 Notwithstanding the foregoing list of investments, in no instance shall a political subdivision invest in obligations described in (i) and (ii) of this Subsection which are (a) collateralized mortgage obligations, (b) inverse floaters, or (c) structured notes. For the purpose of this Section "structured notes" shall mean securities of U.S. government agencies, instrumentalities, or government-sponsored enterprises which have been restructured, modified, and/or reissued by private entities.
The prohibited types of obligations found in Section 2955(A)(b)(iii) are those securities which may have been permissible under the provisions of Section 2955(A)(b)(i) and (ii), except that the security is either a collateralized mortgage obligation ("CMO"), an inverse floater or a structured note. The authority to invest in a direct United States Treasury obligation is found in Section 2955(A)(1)(a), which was not amended in the 1995 session, and which provides that political subdivisions may invest in "direct United States Treasury obligations, the principal and interest of which are fully guaranteed by the government of the United States". Thus the prohibition in Section 2955(A)(1)(b)(iii) only applies to those obligations described in (i) and (ii) of Subsection (b), not the obligations described in Subsection (a). Accordingly, local governments may invest in STRIPS or zero coupon securities issued directly by the U.S. Treasury.
2. Does Section R.S. 33:2955A(1)(b)(iii) allow local governments to invest in securities which are not collateralized mortgage obligations stripped to principal or interest (only) or zero coupon securities issued directly by a U.S. government agency, instrumentality, or government sponsored enterprise?
As long as the investment is a bond, debenture, note, or other evidence of indebtedness issued or guaranteed by "federal agencies and . . . are backed by the full faith and credit of the United States of America. . ." [LSA-R.S. 33:2955(A)(1)(b)(i)] or is a bond, debenture, note, or other evidence of indebtedness issued or guaranteed by "U.S. government instrumentalities, which are federally sponsored . . ." [LSA-R.S.33:2955(A)(1)(b)(ii)], and the investment is not a collateralized mortgage obligation which has been stripped into interest only or principal only obligations, an inverse floater or a structured note, it is a permissible investment under the Act 1126.
3. Does Section R.S. 33:2955A(1)(b)(iii) allow local governments to invest in STRIPS or zero coupon securities issued by the United States Treasury that have been restructured by private entities? In other words, is the United States Treasury considered to be a government agency, instrumentality, or government-sponsored enterprise?
Neither in the law nor in the marketplace is the United States Treasury considered to be a government agency, instrumentality or government-sponsored enterprise; therefore, the prohibition in Section 2955(A)(1)(b)(iii) would not apply. However, in order for the security to be a permissible investment under Section 2955(A)(1)(a) it must be a direct United States Treasury obligation, the principal and interest of which are fully guaranteed by the government of the United States. If after restructuring, the security is no longer a direct U.S. Treasury obligation, it is not a permissible investment under Section 2955(A)(1)(a).
4. Does R.S. 33:2955 allow local governments owning securities issued by the United States Treasury or by a government agency, instrumentality, or government-sponsored enterprise to have a bank, trust company, or brokerage firm act as custodian and hold such securities for the government or must the governmental unit take physical possession of such securities?
Section 2955 is silent as to whether the securities must be held by the government unit; however, because most securities are now issued "book-entry-only" rather than certificated, the book-entry-only securities must be held by a third-party custodian under a fiduciary relationship.
5. If the answer to question 4 is yes, does R.S. 33:2955A(2) apply to permissible money market funds used by custodians for short-term "sweeps" between the sale and purchase of securities?
Yes. Section 2955(A)(2) provides in pertinent part as follows:
 Investment of funds in such mutual or trust fund institutions shall be limited to twenty-five percent of the monies considered available for investment as provided by this Section. In no event shall monies be considered available for investment under the authority of this Section unless and until such funds are determined by the treasurer or chief financial officer of said subdivision, in the exercise of prudent judgment, to be in excess of the immediate cash requirements of the fund to which the monies are credited. As a criteria in making such a determination, any amount of money exceeding ten thousand dollars which is on demand deposit to the credit of a subdivision, or to the credit of any funds and which is not required to meet an obligation for at least forty-five days, or any amount of money exceeding one hundred thousand dollars which is on demand to the credit of a subdivision or to the credit of any funds and which is not required to meet an obligation for at least fifteen days shall be construed available for investment.
Section 2955(A)(1)(e) authorizes investments in "mutual or trust fund institutions which are registered with the Securities and Exchange Commission under the Securities Act of 1933 and the Investment Act of 1940, and which have underlying investments consisting solely of and limited to securities of the United States government or its agencies." Furthermore, this office has opined that only mutual funds created as a Massachusetts business trust, are acceptable investments under Article VII, Section 14
of the Louisiana Constitution. See Op.Atty.Gen. 88-546, as modified by Op.Atty.Gen. 88-546(A). Thus in order to be a permissible investment, the money market fund must meet the criteria of Section 2955(A)(1)(e) and be created as set forth in Op.Atty.Gen. 88-546(A).
6. Were any securities issued directly by a United States government agency or government-sponsored enterprise permissible investments for local governments during the period between September 1991 and the enactments of Act 374 and 1126? If yes, please identify the agency or government sponsored enterprise securities that were permissible investments during that period.
Prior to the effective date of Act 1126, permissible investments included "(b) United States government agency obligations,the principal and interest of which are fully guaranteedby the government of the United States, orUnited States government obligations, the principal andinterest of which are guaranteed by any United Statesgovernment agency, which may include certificates or other evidences of an ownership interest in such obligations, which may consist of specified portions of interest thereon . . ." (Emphasis added)
In connection with the italicized portion of the clause quoted in the immediately preceding paragraph, permissible investments pre-1995 would include those of Farmers Home Administration (FmHA), Federal Financing Bank (FFB), General Services Administration (GSA), Government National Mortgage Association (GNMA), Maritime Administration Guaranteed Ship Financing Bonds issued after 1972, Small Business Administration (SBA), Washington Metro Area Transit Authority (WMATA), Federal Housing Administration (FHA), and some debt of the U.S. Postal Service.[1] It is possible that there were other permissible investments, as this does not purport to be an exhaustive list.
In connection with the above quoted and underlined portion of the pre-1995 version of Section 2955, permissible investments included "United States government obligations, the principal and interest of which are guaranteed by any United States government agency". This is obviously incorrect, as an obligation of the United States government would not be guaranteed by a United States government agency. The word "agency" is missing and the clause should have read "United States governmentagency obligations, the principal and interest of which are guaranteed by any United States government agency". House Bill No. 872, which ultimately became Act 1127, was originally introduced in order to correct the error. H.B. 872 was amended in the House Committee on Ways and Means to list the permissible agencies and government-sponsored enterprises as well as to add the prohibition found in Section 2955(A)(1)(b)(iii).
In interpreting the Revised Statutes "words and phrases should be read with their context and shall be construed according to the common and approved usage of the language." LSA-R.S. 1:3. "When the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." LSA-R.S. 1:4. "Clerical and typographical errors in the Revised Statutes shall be disregarded when the meaning of the legislature is clear." LSA-R.S. 1:5.
It is possible that a court would find that the pre-1995 language of Section (A)(1)(b) to be free and clear of all ambiguity and thus only U.S. government agency obligations fully guaranteed by the U.S. government would have been permissible investments under the Section. It is equally possible that a court of law would find that in order to avoid an absurd result, Section 2955(A)(1)(b) must be read to include the dropped word "agency".
The types of securities which technically were not permissible investments under the pre-1995 version would include, but not be limited to, those of the Farm Credit System, the Federal Home Loan Banks (FHLB), the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA), the Financing Corporation (FICO).[2]
The Resolution Funding Corporation (REFCORP) has issued bonds which are not obligations of, or guaranteed as to principal by the Federal Home Loan Bank System, the Federal Home Loan Banks, the Resolution Trust Corporation or the United States of America; however, the principal amount of the bonds is to be fully repaid from the proceeds of noninterest bearing obligations of the United States issued by the Secretary of the Treasury and deposited in a separate account at the Federal Reserve Bank of New York. The Secretary of the Treasury will pay all interest on the bonds to the extent not paid from other specified sources.[3] This would appear to be tantamount to a direct Treasury obligation so as to eliminate any credit risk.[4]
7. During the period between 1991 and the enactment of Acts 374 and 1126, were any securities issued directly by a United States agency or government-sponsored-enterprise that had been restructured, modified, and/or reissued by a private entity a permissible investment for local government? If any such securities were permissible, please provide examples of such permissible securities.
Yes. In the pre-1995 version of Subsection 2955(A)(1)(b), the following were permissible investments "(b) United States government agency obligations, the principal and interest of which are fully guaranteed by the government of the United States, or United States government obligations, the principal and interest of which are guaranteed by any United States government agency, which may include certificates orother evidences of an ownership interest in suchobligations, which may consist of specified portions ofinterest thereon, such as those securities commonlyknown as CATS, TIGRS, or STRIPS." (Emphasis added)
The Department of the Treasury program know as STRIPS (Separate Trading of Registered Interest and Principal of Securities) was announced in 1985. Prior to the STRIPS program, dealers created synthetic zero-coupon Treasury securities, by buying Treasury securities , separating the future coupon payments from the principal and depositing them in irrevocable trusts with custodian banks. The custodian bank then issued zero-coupon receipts that represented shares in the trust. Each security had a particular maturity value equal to either the coupon or the principal payment doe on Page 6 a maturity date. Some of the most common synthetic stripped securities include CATS (Certificates of Accrual on Treasury Securities) and TIGRS (Treasury Investment Growth Receipts).[5]
8. Acts 374 and 1126 clearly indicate that certain securities are not permissible investments for local government. Should a local government find that it is holding an investment that was a legal investment prior to the enactment of the two acts, but an illegal investment as a result of the acts, must the entity divest itself of the security or may the local government continue to hold the security through its maturity?
Generally, laws are deemed to be prospective in effect unless their language clearly indicates otherwise; the exceptions to this general rule are laws which are interpretative, remedial or curative, and procedural. Green v. Liberty Mutual InsuranceCo., 352 So.2d 366, writ denied 354 So.2d 210 (La.App. 4th Cir. 1977). The changes to LSA-R.S. 33:2955 were substantive in nature and thus cannot be given retroactive application. Furthermore, Act 1026 enacted Subsection (D) to provide:
 After August 15, 1995, the investment of monies by a municipality, parish, school board, or other political subdivision of the state in violation of the provision of this Section shall constitute an intentional performance of a duty in an unlawful manner and may be prosecuted pursuant to R.S. 14:134. (Emphasis added)
Article 1, Section 10 of the United States Constitution and Article I, Section 23 of the Louisiana Constitution prohibit the enactment of an ex post facto law. An ex post facto law is one which operates upon a subject not liable to it at the time the law was made. Kring v. Missouri, 107 U.S. 221,2 S.Ct. 443, 27 L.Ed. 506. An ex post facto, by definition, is one which is passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed. Black's Law Dictionary 662 (Rev. 4th ed. 1968). To construe Act 1126 to have retroactive application would violate the prohibition against the enactment of ex post facto laws.
Based upon the foregoing, it is the opinion of this office that the entity is not legally required to divest itself of securities which were legal when acquired prior to August 15, 1995 but were no longer legal investments on August 15, 1995. Of course, this opinion cannot and will not address whether it is a prudent and sound business decision for a political subdivision to continue to hold certain securities, such as an interest only CMO.
In connection with the business decisions of the local governmental entity, it should be noted that Act 374 requires that "all political subdivisions . . . [shall] develop and adopt an investment policy that details and clarifies investment objectives and the procedures and constraints necessary to reach those objectives. All such investment policies should:
(1) Reflect the mandate to manage public funds prudently.
(2) Place appropriate emphasis on the goals of safety of principal first, liquidity second, and yield third.
(3) Establish internal controls for any derivatives in use to ensure that the risks inherent in derivatives are adequately managed."
Thus after adoption of its investment policy, a political subdivision may determine that certain investments violate that policy, whether or not the investment is or was legal.
9. If the answer to question 8 is no, is there a grace period during which a local government may liquidate such securities in an orderly manner without violating the statute, or must it dispose of the security immediately? You will note that SCR 198 refers to a plan of divestiture.
Because answer 8 does not require divestiture, this question is moot.
10. Certain units of local government may find that they are holding investments that were illegal prior to enactment of Acts 374 and 1125 and are illegal after the passage of the acts. Must these entities sell these securities or may the local governments continue to hold the securities through maturity?
If the investment was illegal prior to August 15, 1995 and remains illegal thereafter, the political subdivision should take appropriate action to divest themselves of the security. By appropriate action, we mean that the divestiture should be accomplished in accordance with the adopted investment policy as well as sound financial management taking into consideration market conditions and other factors which may affect the economics of the transaction. We do not suggest that all such securities be "dumped" if the timing of the sale would be to the detriment of the political subdivision.
11. If the answer to question 10 is no, is there a grace period during which a local government may liquidate such securities in an orderly manner without violating this statute, or must it dispose of the security immediately? You will note that SCR 198 refers to a plan of divestiture.
This question was answered in number 10 as we suggest that political subdivisions not act precipitously and to their detriment in the divestiture of impermissible investments.
12. Is the Louisiana Asset Management Pool, Inc. (LAMP) a permissible investment for municipalities?
LAMP was created pursuant to Art. VII, Sec. 14(C) of the Louisiana Constitution and the Local Services Law, LSA-R.S.33:1321, et seq. as a pooled investment program, not as an investment, itself. Each political subdivision enters into a cooperative agreement for the purpose of operating a pooled investment program. LAMP receives deposits from each political subdivision and essentially functions as a professional financial advisor to those political subdivisions which elect to participate and become depositing members within the pool. The political subdivisions which deposit money in LAMP retain a separate ownership interest in the investments purchased. See Op.Atty.Gen. 94-186.
13. May multiple municipalities combine moneys from multiple funds in a cooperative effort for investment purposes?
Yes, this would be permissible under the Local Services Law, LSA-R.S. 33:1321, et seq. which authorizes political subdivisions to engage jointly in the exercise of any power, provided that one of the political subdivisions is authorized to exercise that power. Furthermore, Art. VII, Sec. 14(C) of the Louisiana Constitution authorizes the State and its political subdivisions, for a public purpose, to engage in cooperative endeavors with each other. Of course, the pooled monies may only be invested in those types of securities that are allowable investments for political subdivisions. Furthermore, the pool would have to be structured so that one political subdivision could not assume the losses of another political subdivision, as that would violate Art. VII, Sec. 14(A) prohibiting the donation, loan or pledge of public funds. See City of Port Allen v. LouisianaMunicipal Risk Management Agency, Inc., 439 So.2d 399 (La. 1983); Op.Atty.Gen. 92-192.
14. Are there any maturity restrictions governing the investment of municipal funds?
The statutes do not provide any maturity restrictions; however, it is suggested that maturity restrictions should be part of a political subdivision's investment policy.
15. SCR 198 appears to state that all non-United States government agencies or instrumentalities guaranteed CMO's are improper investments. Is this an accurate interpretation and are holders of such investments required to divest themselves of these securities?
SCR 198 states that "derivative investments, including but not limited to collateralized mortgage obligations (CMOs), which are not fully guaranteed by the government of the United States are not enumerated in LSA-R.S. 33:2955 . . ." and thereafter directs all political subdivisions (i) to cease investing monies in all derivative investments, (ii) to determine if any derivative investments are included in the mutual funds in which the political subdivision has invested, (iii) to develop a plan to comply with LSA-R.S. 33:2955.
In accordance with the Louisiana Constitution of 1974 only a joint resolution proposing a constitutional amendment (Art. XIII, Sec. 1) and resolutions suspending laws (Art. III, Sec. 20) have the effect of law. The legislature shall enact no law except by a bill introduced during that session. Art. III, Sec. 15. No resolution adopted by the legislature "shall required the signature or other action of the governor to become effective." Art. III, Sec. 17.
All other resolutions of the legislature are the form in which the legislature expresses an opinion or determination which is normally recognized as a mere expression of an opinion concerning a given matter or thing and having only a temporary effect.State Licensing Board for Contractors, et al. v.State Civil Service Commission, 240 La. 331, 123 So.2d 76
(1960); Watts v. Town of Homer, 207 So.2d 844 (La.App. 2d Cir. 1972). A concurrent resolution does not have the force and effect of law. State Licensing Board forContractors, id.; Op.Atty.Gen. 82-814.
SCR 198 does not have the force and effect of law, but is merely the opinion of the legislature on political subdivisions holding derivatives; however, political subdivisions are not required to comply with SCR 198.
16. R.S. 33:2955D(3) contains a definition of "structured note". In addition, the investment community often labels certain investment instruments as "structured notes." Would the fact that the investment community considers an instrument a "structured note" cause the instrument to be an improper investment or would the investment have to meet the definition within R.S. 33:2955D(3) to be considered a structured note?
"Structured note" is defined in Section 2955(A)(1)(b)(iii) to mean "securities of U.S. government agencies, instrumentalities, or government-sponsored enterprises which have been restructured, modified, and/or reissued by private entities." In order to determine whether a security is a "structured note" as defined in Section 2955(A)(1)(b)(iii), one must examine the security itself and not the caption or title of the security.
It has been suggested that the Louisiana definition of structured note is insufficient to prohibit investment in instruments that the market defines as structured notes, and that such investments are extremely complex with high risk factors. The Federal Reserve Bank has issued a publication on Structured Notes which introduces common structured notes and explains the type of analysis in which investors should engage both prior to and subsequent to purchase.[6] In answer to the question of "What are structured notes?", it is stated:
 Unlike straight derivatives whose entire value is dependent on some underlying security, index or rate, structured securities are hybrids, having components of straight debt instruments and derivatives intertwined. Rather than paying a straight fixed or floating coupon, these instruments' interest payments are tailored to a myriad of possible indices or rates. The Federal Home Loan Bank (FHLB), on e of the United States' largest issuers of such products, has more than 175 indices or index combinations against which cash flows are calculated. In addition to the interest payments, the securities' redemption value and final maturity can also be affected by the derivatives embedded in structured notes. Most structures contain embedded options, generally sold by the investor to the issuer. These options are primarily in the form of caps, floors, or call features. The identification, pricing and analysis of these options give structured notes their complexity.
Based upon this and other information we have received on structured notes, we must express our concern about the wisdom of political subdivisions investing in structured notes which may be permissible under state law and suggest that if may be prudent for political subdivisions to prohibit the investment of structured notes in their investment policy. This may be a matter which should be addressed in future legislation.
Trusting this adequately responds to your request, I remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: __________________________________________ MARTHA S. HESS Assistant Attorney General
RPI:MSH:msh
DATE RECEIVED: OCTOBER 5, 1995
DATE RELEASED:
MARTHA S. HESS, ASSISTANT ATTORNEY GENERAL
[1] See Handbook of U.S. Government Federal AgencySecurities, 34th Edition, The First Boston Corporation, pgs. 90-91; and, Public Securities Association GovernmentSecurities Manual, Chapter 2.
[2] See Handbook of U.S. Government Federal AgencySecurities, pgs. 90-91.
[3] See Offering Circular, Resolution Funding Corporation Bonds, October 13, 1989.
[4] See Moody's Public Finance Department, RatingNews, "Moody's Revises Guidelines for #Aaa Refunded Bonds, REFCORP Bonds Now Permitted As Eligible Investments for Escrows", August 22, 1990.
[5] See Public Securities Association, GovernmentSecurities Manual, pg. 3-1.
[6] See Product Summary, Structured Notes, Federal Reserve Bank of Chicago, November 1994.